JOHN M. PHILLIPS *v.* WARDEN, STATE PRISON
(14112)

SHEA, GLASS, COVELLO, BORDEN and F. X. HENNESSY, Js.

Argued May 3—decision released August 13, 1991

*Timothy H. Everett* and *Giovanna M. Tiberii,* certified legal intern, with whom, on the brief, were *Todd D. Fernow* and *Michael R. Sheldon,* for the appellant (petitioner).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *John M. Connelly,* state's attorney, and *Patricia King,* former deputy assistant state's attorney, for the appellee (respondent).

BORDEN, J. The dispositive issue in this habeas corpus appeal is whether the petitioner, John M. Phillips, was denied his right to the effective assistance of counsel under the sixth amendment to the United States constitution[1] because an actual conflict of interest adversely

---

[1] The sixth amendment to the United States constitution provides: "Further provisions respecting criminal prosecutions.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously

affected his lawyer's performance. In 1983, the petitioner was convicted, after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70, unlawful restraint in the first degree in violation of General Statutes § 53a-95, and burglary in the first degree in violation of General Statutes § 53a-101. Prior to and throughout the petitioner's trial for these offenses, his attorney was Bernard L. Avcollie, a convicted murderer who had been allowed to continue legal practice until he had completed the process of appealing his conviction. We conclude that, under the particular facts of this case, the petitioner was denied his right to the effective assistance of counsel, and that he is therefore entitled to a new trial.

The petitioner appeals from the judgment of the habeas court, *Axelrod, J.,* denying his petition for a writ of habeas corpus. In the habeas court he claimed that: (1) he was denied his constitutional right to the effective assistance of counsel at his criminal trial because Avcollie was burdened by an actual conflict of interest that adversely affected Avcollie's performance on his behalf; and (2) the trial court at his criminal trial, *Henebry, J.,* denied him his constitutional right to the effective assistance of counsel by failing to inquire about a possible conflict of interest that the court knew or should have known existed. With respect to the first claim, the habeas court concluded that no conflict of interest existed and that, even if there had been such a conflict, it did not affect Avcollie's performance as his lawyer. With respect to the second claim, the habeas

ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The sixth amendment is applicable to the states through the fourteenth amendment. *Pointer* v. *Texas,* 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

court concluded that, although there was a potential conflict of interest about which the trial court should have initiated an inquiry, the petitioner was not entitled to a new trial because of an absence of an actual conflict of interest. The habeas court, accordingly, rendered judgment denying the writ of habeas corpus.

The petitioner appealed to the Appellate Court. The Appellate Court agreed with the habeas court that there had been no conflict of interest, and that it was, therefore, unnecessary to determine whether any such conflict adversely affected Avcollie's performance at the petitioner's criminal trial. *Phillips* v. *Warden,* 23 Conn. App. 63, 69 n.3, 579 A.2d 1092 (1990). The Appellate Court also concluded that, even if the original trial court should have known of a potential conflict of interest, its failure to inquire was harmless beyond a reasonable doubt because of the absence of an actual conflict of interest. Id., 74–75. Accordingly, the Appellate Court affirmed the judgment of the habeas court. Id., 75.

We granted certification to appeal limited to two issues: (1) whether the petitioner was denied his constitutional right to the effective assistance of counsel pursuant to the sixth amendment to the United States constitution because of an actual conflict of interest that adversely affected his lawyer's performance; and (2) whether the absence of an inquiry by the trial court about a conflict of interest denied the petitioner his constitutional right to the effective assistance of counsel.[2]

---

[2] The precise wording of the issues certified for appeal, taken from the petitioner's petition for certification, was as follows: "1. Was the petitioner's constitutional right to the undivided loyalty of counsel violated where his attorney, Bernard L. Avcollie, still practicing law after his own conviction in a highly publicized case in the same courthouse, was unable to pursue certain courses of action, such as probing individual voir dire to protect his client against juror bias, because Avcollie put his own interest in staying on the case ahead of his professional judgment that most members of

*Phillips* v. *Warden,* 216 Conn. 822, 581 A.2d 1056 (1990). We conclude that, under the facts of this case, the petitioner must prevail on the first issue because (1) Avcollie violated his duty of undivided loyalty to the petitioner by continuing to represent the petitioner at his trial, and (2) as a direct result thereof, Avcollie placed himself in the untenable position of choosing to forgo individual voir dire regarding his own murder conviction. We, therefore, need not reach the second issue. Accordingly, we reverse the judgment of the Appellate Court.

The pertinent facts found by the habeas court or appearing of record are undisputed. On April 8, 1983, at the judicial district of Waterbury, the petitioner was convicted, after a jury trial, of breaking into the Naugatuck apartment of the victim, an eighty-one year old woman, at approximately 12:30 a.m. on September 2, 1982,[3] and restraining and sexually assaulting her. *State* v. *Phillips,* 17 Conn. App. 391, 392, 552 A.2d 837 (1989). The trial court sentenced the petitioner to an effective sentence of thirty years. The Appellate Court affirmed that conviction on direct appeal. Id.[4] After his

the jury panel knew of his conviction and his 'nagging feeling that [his] reputation was going to hurt this man [the petitioner]'?

"2. Was the trial court's violation of its constitutional duty to inquire into defense counsel's possible conflict of interest harmless beyond a reasonable doubt in light of the petitioner's failure to prove an actual conflict of interest by a preponderance of the evidence?"

We have rephrased the issues certified to conform to the issues as briefed by the parties and as properly presented by the appeal.

[3] The statement in the Appellate Court opinion; *State* v. *Phillips,* 17 Conn. App. 391, 392, 552 A.2d 837 (1989); that the offense took place on September 2, 1983, is incorrect. It is undisputed that the petitioner's trial took place in April, 1983, and the Appellate Court record, which we have examined, indicates that the offense took place on September 2, 1982.

[4] The record does not disclose the reason for the delay between May, 1983, when the defendant was sentenced, and November, 1988, when the defendant's direct appeal was argued before the Appellate Court. The Appellate Court record does disclose, however, that in July, 1986, the petitioner filed this habeas corpus action pro se, and that the habeas action had been pro-

conviction the petitioner filed a writ of habeas corpus which was denied by the habeas court. The Appellate Court affirmed the decision of the habeas court; *Phillips* v. *Warden,* supra, 23 Conn. App. 63; and this appeal followed.

The petitioner's claim of a conflict of interest stems from the extensively publicized murder conviction with which his lawyer was burdened at the time of his original trial, and the claimed repercussions that the burden had on the petitioner's case. The petitioner's attorney, Avcollie, had been a prominent figure in the Waterbury area for many years prior to the events in question. He had been involved in politics in his hometown of Naugatuck since 1954, and was a state representative from 1967 through 1974, when he was defeated in a primary in which his morality became a public issue.

In October, 1975, the body of Avcollie's wife was found floating in the swimming pool of their home in Naugatuck. Twenty-three days later, Avcollie was indicted for his wife's murder, and in 1977 a jury composed of citizens from towns in the Waterbury judicial district convicted him of murdering her by strangling her to death. After the trial court set aside the conviction for insufficiency of evidence, the state appealed and this court reinstated the conviction. *State* v. *Avcollie,* 178 Conn. 450, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980). Upon denial of certiorari by the United States Supreme Court, Avcollie was sentenced in the Waterbury Superior Court on March 14, 1980, to an indefinite term of eighteen years to life imprisonment. Avcollie appealed, and on December 14, 1982, this court affirmed his con-

ceeding apace while the direct appeal was pending. The habeas court filed its memorandum of decision on January 9, 1989, and the Appellate Court released its decision on the petitioner's direct appeal on January 24, 1989. *State* v. *Phillips,* 17 Conn. App. 391, 552 A.2d 837 (1989).

viction. *State* v. *Avcollie,* 188 Conn. 626, 453 A.2d 418 (1982). On May 16, 1983, the United States Supreme Court denied Avcollie's petition for certiorari. *Avcollie* v. *Connecticut,* 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983).

The criminal proceedings against Avcollie between November 21, 1975, when he was indicted, and May 16, 1983, when his petition for certiorari was denied, were the source of numerous headlines in the Waterbury and Naugatuck newspapers. Those newspapers have wide circulation in the Waterbury judicial district from which the jurors for the petitioner's criminal trial were chosen. This publicity had prompted Avcollie and his attorneys at his criminal trial to move twice for a change of venue because they were concerned about the negative impression that potential jurors may have gained from the publicity about the case. The state was also concerned and successfully moved in the Waterbury Superior Court for a protective order, entered on November 26, 1975, to protect Avcollie's right to a fair trial by a fair and impartial jury from being impaired by prejudicial publicity.

Avcollie continued to practice law, both before and after his conviction was reinstated and after he was sentenced, and while his appeal from his conviction was pending. In fact, there was discussion among the judges of the Superior Court about the propriety of his continuing to practice law. After his sentence was imposed, Avcollie reached an agreement with the grievance committee for the judicial district of Waterbury to permit him to practice law until all direct appeals of his murder conviction, including a petition for certiorari to the United States Supreme Court, were exhausted. The committee believed that it was powerless to take any action against Avcollie because it read the Practice Book to preclude a temporary suspension, even after conviction and pending an appeal, and because the

state's attorney's office would not release evidence to the committee while the appeal was pending.[5]

[5] At the time Avcollie was sentenced in 1980, Practice Book § 31 provided in pertinent part: "[SUSPENSION, DISBARMENT AND UNAUTHORIZED PRACTICE OF LAW]—CAUSE NOT OCCURRING IN PRESENCE OF COURT

"Presentment of attorneys for misconduct not occurring in the actual presence of the court shall be made by written complaint of the grievance committee or of the state's attorney or of any member of the bar by direction of the court. Upon the filing of such complaint a rule to show cause shall issue to the defendant, who may make any proper answer within twenty days from the return of the rule, and shall have the right to be heard in his own defense and by witnesses and counsel. Unless otherwise ordered by the court, such complaints shall be prosecuted by local bar counsel and heard as soon as practicable, and upon such hearing the court shall make such lawful order as may to it seem just. Such complaints shall be proceeded with as civil actions."

William St. John, Jr., who had been the counsel to the grievance committee, testified that after Avcollie had been arrested but before his trial the committee took no action because he had not been convicted and because "there was at the time no mechanism in the Practice Book for a temporary-type suspension. Our choice was to go for a full reprimand, or a full disciplinary action, or nothing. And we determined that from doing research that we would have to prove the underlying conduct of an accusation in order to establish grounds for some type of discipline. That was, the bottom line was we would have to prove that he murdered his wife.

"We spoke with the State's Attorney's Office and determined from them that they felt it was inappropriate for them to give us their files since it was a pending criminal matter.

"Taking all of those things into consideration, the Committee determined there really wasn't anything they should do, or could do at that time and did not do anything."

St. John also testified that, after the jury returned its guilty verdict, the committee took no action because the trial court had set the verdict aside and acquitted Avcollie. He testified further that, after the conviction was reinstated by this court, the committee accepted statements by Avcollie and his attorney that if his appeals, including a petition for certiorari to the United States Supreme Court, were unsuccessful he would voluntarily surrender his license to practice law.

The committee's impotence in the face of Avcollie's conviction for murder, after that conviction had been reinstated and after sentence had been imposed, is probably attributable to this court's decision in *State* v. *Tedesco,* 175 Conn. 279, 292–94, 397 A.2d 1352 (1978). In that decision, we held that § 20 of the 1963 Practice Book, which provided for summary discipline of an attorney, without a complaint or hearing, for misconduct occurring in the presence of the court, did not apply to "a conviction evidencing mis-

Nonetheless, the committee, concerned that members of the public would retain Avcollie ignorant of the fact

conduct elsewhere." Id., 294. Thus, the committee believed that, despite Avcollie's conviction, it would have been required independently to prove, in the disciplinary proceedings, that Avcollie murdered his wife, at least until his appeals were exhausted. *Tedesco* did not necessarily hold, however, that § 21, which later became § 31, did not provide a basis for disciplinary action, including suspension or disbarment, upon conviction of a major felony, as long as the procedures provided by § 31 were followed. Indeed, the committee's reading of § 31 would have required it to prove that Avcollie murdered his wife, even after his conviction had been affirmed by this court and certiorari denied by the United States Supreme Court.

In any event, the committee's perceived dilemma has been resolved by Practice Book § 28B, which provides: "[SUSPENSION, DISBARMENT AND UNAUTHORIZED PRACTICE OF LAW]—DISCIPLINE OF ATTORNEYS CONVICTED OF A FELONY

"(a) The clerk of the superior court location in this state in which a lawyer is convicted of a felony shall transmit, immediately upon the imposition of sentence, a certificate of the conviction to the statewide bar counsel and to the statewide grievance committee. The statewide bar counsel or his designee shall, pursuant to Sec. 31, file a presentment against the lawyer predicated upon the conviction. No entry fee shall be required for proceedings hereunder.

"(b) The provisions of paragraph (c) notwithstanding, after sentencing an attorney who has been convicted of a felony, the judge who presided at the trial may in his discretion enter an order immediately suspending the attorney pending final disposition of a disciplinary proceeding predicated upon the conviction. Thereafter, upon good cause shown, the judge before whom the presentment is pending may, in the interest of justice, set aside or modify the interim suspension.

"(c) A presentment filed pursuant to this section shall be heard by the judge who presided at the trial which resulted in the felony conviction. A hearing on the presentment complaint addressing the issue of the eligibility of such attorney to continue the practice of law in this state shall be held within thirty days of sentencing or the filing of the presentment, whichever is later. Such hearing shall be prosecuted by the statewide bar counsel, an assistant bar counsel or an attorney designated pursuant to Sec. 31A. At such hearing the attorney shall have the right to counsel, to be heard in his own defense and to present evidence and witnesses in his behalf. After such hearing, the judge shall enter an order dismissing the matter or imposing discipline upon such attorney in the form of suspension for a period of time, disbarment or such other discipline as the judge deems appropriate.

"(d) Whenever the judge enters an order suspending or disbarring an attorney pursuant to paragraphs (b) or (c) herein, it may appoint a trustee,

that he had been convicted of murder, took the unusual step of moving in the Superior Court pursuant to then Practice Book § 32,[6] to have its report released to the public. This was, in the committee's view, the "least wrong thing to do in the circumstances."[7] The order of the Superior Court authorizing the public release of the committee's report was signed by Judge Henebry, who would later preside at the petitioner's criminal trial.

As a result of the notoriety concerning his prosecution for murdering his wife, Avcollie's previously flourishing legal practice suffered severely. He ordered his young associate, Michael McVerry, to leave the office

pursuant to Sec. 46B, to protect the clients' and the attorney's interests."

We note further, however, that, even under the rules as they existed in 1983, the fact that Avcollie was permitted to continue to practice law does not also mean that he was somehow entitled to try a case under circumstances that violated his constitutional duty of loyalty to his client.

[6] Practice Book § 32 as revised through 1979, provided: "RECORDS OF GRIEVANCE COMMITTEE

"The records and transcripts, if any, of hearings conducted by a local grievance committee shall be filed with the clerk of the superior court where they shall be available only to that committee or to the statewide grievance committee or to the standing committee on recommendations for admission to the bar, unless otherwise ordered by the court."

[7] The report, dated April 10, 1980, recited the history of Avcollie's prosecution and conviction, including the first appeal by the state and culminating in the sentencing on March 14, 1980. It stated, in part, that "[t]he Committee has determined that it is not consistent with due process of law or fundamental fairness to take any action pursuant to Rule 31 while direct appeals are pending.

"This decision may not be applauded in all circles, but it is not the Committee's function to satisfy or please any group large or small. Every citizen in the country is entitled to due process of law and lawyers are no exception." After noting that the committee would take further action if Avcollie's direct appeals were unsuccessful, the report stated that "[t]his entire matter has received widespread coverage in the media and it appears to the Committee that legal services consumers have sufficient facts in their possession to determine whether or not they wish to engage Attorney Avcollie's services." The report concluded: "In order to avoid confusion on the part of the public and the organized bar, it is important that this report be made public."

in order for McVerry to continue to make a living. After his conviction was reinstated, Avcollie took cases that he would have refused previously, including a sexual misconduct case. When he was successful in obtaining a disposition of accelerated rehabilitation for that client, he received many requests to take other cases involving sex crimes.

Avcollie tried one of those cases to a jury in September and October, 1982. The charges against Avcollie's client were sexual assault, incest and risk of injury to a child. During the jury selection, at the general introduction to the venirepersons, one of the venirepersons excused herself because she lived in Naugatuck and knew about Avcollie's conviction. Avcollie did not mention his conviction for murder to the venirepersons, either during the general introductions or individual voir dire, because his appeal to this court had not yet been decided. That case resulted in a mistrial, and Avcollie did not represent the defendant on the second trial.

On September 11, 1982, the petitioner was arrested on the charges that form the basis of this habeas corpus action. He was incarcerated in default of bond. His girlfriend hired McVerry, Avcollie's former associate, to represent him at arraignment. At the courthouse on the day of the arraignment, McVerry introduced the petitioner to Avcollie and suggested that he retain Avcollie to represent him.

The petitioner was a native of Illinois, had moved to Connecticut in 1978, and was unaware that Avcollie had been convicted of murdering his wife and that Avcollie was appealing the conviction. At their first meeting, Avcollie did not inform the petitioner of these facts. Avcollie asked the petitioner about his case and quoted a retainer fee of $2000. The petitioner told Avcollie that he was innocent of the charges against

him, that he had been working in Port Chester, New York, when the crimes were committed, and that two coworkers would support that alibi.[8] Avcollie undertook to represent the petitioner because he needed the $2000 and because he believed that the case would not go to trial.

The petitioner first learned of Avcollie's murder conviction three days later, when he was released on bail. His girlfriend told him that Avcollie had been convicted of murdering his wife, but that the conviction had been overturned by the trial judge and that the state was appealing from that action. This information was inaccurate, because by then Avcollie's conviction had been reinstated by this court, he had been sentenced, and he was appealing from the conviction to this court. Nonetheless, the petitioner decided to retain Avcollie on the recommendation of friends and relatives.

Approximately two weeks after his arraignment, the petitioner met Avcollie for a second time. This meeting took place at Avcollie's office. The petitioner hired Avcollie as his lawyer and paid him the $2000 retainer. Avcollie disclosed nothing to the petitioner about his murder conviction or appeal therefrom.

Approximately one month later, near the end of October, 1982, the petitioner and Avcollie met for a third time, at Avcollie's office. Avcollie told the petitioner that it was likely that the case would go to trial, necessitating additional fees beyond the retainer. Avcollie did not mention his murder conviction or appeal to the petitioner.

---

[8] The Appellate Court record of the petitioner's direct appeal indicates that the petitioner testified in his own defense at his criminal trial, denying that he had been in the victim's apartment at the time of the crimes, and claiming that he was at work in Port Chester, New York, at that time. Two of the petitioner's coworkers corroborated his testimony. The state impeached the coworkers' testimony, and presented testimony of the victim, her son-in-law and a neighbor identifying the petitioner as the masked perpetrator of the crimes.

At a date sometime after January 20, 1983, the petitioner and Avcollie met again at Avcollie's office. By then this court, on December 14, 1982, had affirmed Avcollie's conviction. *State* v. *Avcollie,* supra, 188 Conn. 626. Avcollie told the petitioner that when the case went to trial the petitioner would have to pay him for his time in court. For the first time, Avcollie mentioned his own legal situation, telling the petitioner that this court had affirmed his conviction. Avcollie told the petitioner that he was concerned that his own problems could affect the jury's attitude toward the petitioner, but he did not go into any detail about this. He assured the petitioner that he could do a credible job of representing him despite those problems. Upon this assurance, the petitioner told Avcollie that he wanted him to continue as his attorney. Avcollie did not secure any written waiver from the petitioner consenting to his continued representation.

At this meeting, Avcollie had two goals: (1) to determine that the petitioner was "acquainted with [Avcollie's] bad fortunes at that time"; and (2) to assure himself that his continued representation would be on a "cash and carry basis." Avcollie was considering three options: (1) withdrawing from the case altogether; (2) informing the entire jury panel of his conviction during the general introduction phase of voir dire; and (3) questioning each juror, during the individual voir dire phase, about the juror's knowledge of Avcollie's situation.

Avcollie rejected the option of withdrawal because he had already invested a significant amount of time in the case, because he could not afford to return the retainer to the petitioner, and because he wanted the additional fees that he would earn at the trial. The petitioner's case came to trial in the Waterbury Superior Court on March 15, 1983, when jury selection began. Avcollie had elected the second option, namely, to cover

the issue of his murder conviction during the general introductory phase of the voir dire. He had intended to highlight in his introductory comments to the panel of venirepersons the fact that he had been a defendant himself, that he had recently had his case decided against him, and that he did not want the jurors to hold those facts against the petitioner.

Avcollie, however, did not highlight any such facts. In his general introductory remarks to the panel of venirepersons, he stated only as follows: "If you know anything about any of the people that I have mentioned that work in my office or particularly about me, if there is anything that you know or feel about me that will inhibit your ability to judge this man fairly, then you should so indicate. You are not of course sitting in judgment of his attorney nor of his office staff any more than you are sitting in judgment of the State's Attorney's office, you're sitting in judgment of the defendant."[9]

Although Avcollie believed that most of the venirepersons knew of his murder conviction, he asked no questions during the individual voir dire concerning that knowledge.[10] He challenged no jurors for cause

---

[9] The habeas court specifically noted Avcollie's testimony that he thought that his remarks had been more specific than these, and that in Avcollie's view these remarks did not "go much further than an instruction I might have made had I not had a personal problem." The court also specifically noted that the respondent's expert witness, attorney Louis S. Avitabile, characterized these remarks as the "standard introduction of a defense attorney to a jury panel." The court also noted that the petitioner's expert witness, attorney Richard R. Brown, opined that these remarks provided an insufficient basis for a defense attorney competently to judge the fairness of a potential juror.

[10] The habeas court made no specific findings regarding the reasons for Avcollie's failure, during the individual voir dire, to pursue the question of whether any of the venirepersons knew of his murder conviction and would hold that fact against the petitioner. Avcollie's testimony suggests either or both of two motives: (1) personal reluctance; and (2) strategy. Avcollie testified on direct examination that "I don't really know why I didn't do more than [his general introductory remarks], other than I felt

during the individual voir dire. It is undisputed that the jurors who sat on the petitioner's criminal trial lived in the Waterbury area during the period from 1975 through 1983. It is also undisputed that Avcollie's murder of his wife was the subject of extensive press coverage from November 21, 1975, when Avcollie was indicted, through April 8, 1983, when the petitioner's jury returned its verdict.[11]

The Appellate Court defined the relevant conflict of interest as follows: "A conflict of interest has been determined to be present where one party in interest stands to gain significantly by adducing evidence, advancing arguments or engaging in conduct that is detrimental to the interests of another party." *Phillips* v. *Warden,* supra, 23 Conn. App. 69. This definition was drawn from two decisions of this court that involved representation of multiple criminal codefendants by the same lawyer. See *Festo* v. *Luckart,* 191 Conn. 622, 631, 469 A.2d 1181 (1983); *State* v. *Marion,* 175 Conn. 211, 219, 397 A.2d 533 (1978). The Appellate Court agreed with the habeas court that "there was no conflict of interest between the petitioner and Avcollie. To the contrary, their interests converged at all times to achieve the ultimate goal of acquittal, and

that that was enough. And I still wasn't in the habit of talking a lot about [his murder conviction] and, frankly, I was probably a little squeamish about mentioning it over and over and over again . . . ." He also testified that "in the back of my mind I constantly had the nagging feeling that my reputation was going to hurt this man, and I had to continue to talk myself out of it." He testified on cross-examination, however, that "if I covered it in more in depth in the individual voir dire, I may be doing more harm than good for [the petitioner]. . . . And if they didn't know, before I questioned them, that I was in trouble, they'd sure know after I questioned them. So, I elected to pass on that at that time . . . rather than go into it in detail."

[11] In addition to copies of the press clippings, the evidence in the habeas court included the testimony of St. John, Avitabile, Avcollie and Judge Henebry that the press coverage was very extensive, and the report of the grievance committee that Avcollie's conviction had received widespread press coverage. See footnote 7, supra.

have not been shown to have diverged at any point."
*Phillips* v. *Warden,* supra, 23 Conn. App. 70–71.[12]

[12] The Appellate Court also concluded that "Avcollie apprised the petitioner of the inherent risks of his representation as required under the Code of Professional Responsibility, DR 5-105 (C), and the petitioner chose, nevertheless, to continue their attorney-client relationship." *Phillips* v. *Warden,* 23 Conn. App. 63, 71, 579 A.2d 1092 (1990). The petitioner challenges this conclusion, and the respondent claims that it is supported by the record. The respondent does not claim, however, and specifically disclaimed in the habeas court, that the petitioner waived any conflict of interest that Avcollie may have had. In any event, we agree with the petitioner that this conclusion of the Appellate Court is not supported by the record.

Disciplinary Rule 5-105 (C) of the ABA Model Code of Professional Responsibility provides as follows: "In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Disciplinary Rule 5-105 (A) and (B) provide as follows: "(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105 (C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105 (C)."

First, the habeas court made no findings that would support a conclusion that Avcollie made "full disclosure of the possible effect of [his] representation on the exercise of his independent professional judgment on behalf of" the petitioner. Indeed, the court's finding of the lack of detail supplied by Avcollie to the petitioner is, if anything, to the contrary.

Second, the portions of the record relied on by the respondent to support the Appellate Court's conclusion do not do so. The respondent points to certain testimony of Avcollie regarding his discussions with the petitioner. Avcollie testified that at the post-January 20, 1983 meeting at Avcollie's office, Avcollie "told [the petitioner] of . . . what had, by that time, grown to be a major concern of mine . . . that my reputation and my problems might rub off on [him]. And I told him that I was concerned about that, *but that I felt I could correct that by comments to the jurors in a timely fashion, and hopefully if we had honest jurors, they would judge John on John, not on Bernie.* " (Emphasis added.) Avcollie also testified that at that meeting he told the petitioner that they would have the opportunity to question each

The Appellate Court also rejected the petitioner's claim that it was a violation of Avcollie's duty of loy-

potential juror individually, "but I didn't give him my solution to my problem. *I didn't go into that with him because at the time, frankly, I didn't have a solution to the problem. I was still carrying it around in my mind and on my conscience with it.* . . . My problem was that I was concerned that the jurors may be prejudiced against John because of my notoriety and my conviction. . . . I told him what my situation was . . . *and I told him that I felt I could represent him and do a good job,* but that if he felt squeamish about it, that he should . . . elect to get other counsel. He felt that, as I recall, that he would stick with me." (Emphasis added.)

Based on this record, we cannot conclude that there was the kind of full disclosure of the inherent risks of Avcollie's continued representation that DR 5-105 (C) contemplates. There was no disclosure, for example, of Avcollie's own notoriety in the community, of the degree of notoriety of his murder trial and conviction, of the fact that he and his attorneys had felt it necessary to move for a change of venue in his own case, nor of the protective order obtained by the state because of that press coverage. Nor was there any disclosure of the fact that, contrary to the petitioner's inaccurate understanding, Avcollie's own appeal of his conviction—as opposed to the state's earlier appeal of the trial judge's action in setting the verdict aside—had recently been rejected by this court, and that, absent the unlikely grant of certiorari by the United States Supreme Court, Avcollie himself was literally on his way to prison, or that those facts had themselves been the subject of extensive press coverage in the Waterbury area. Furthermore, Avcollie undercut what meager disclosure there was by accompanying it with his assurance that he could "correct" the problem "by comments to the jurors in a timely fashion"—an assurance that he failed to fulfill.

Given this record, the dissent's reliance on a purported waiver by the petitioner is wholly misplaced. Indeed, as noted above, the respondent specifically disclaimed any such reliance in the habeas court. When asked by the court whether "the Respondent claim[s] that the Petitioner waived his right to conflict-free representation," the respondent answered: "Not in the technical sense. No, Your Honor, I don't think there's any basis for making that claim in this representation. It would be the Respondent's position that a waiver in the technical sense, or in the word-of-the-art, involves a knowing, intelligent, and voluntary waiver of a known right which is something that takes place somewhere on the record, in some form. And there has been no claim that anyone ever conducted such an inquiry or a canvass of this . . . petition[er] in this regard. So, obviously, no. I just don't think we can make that kind of a claim." As a result, the habeas court was not called upon to address the factual issue of waiver, on which the respondent bore the burden of proof. *State* v. *Weidenhof,* 205 Conn. 262, 267, 533 A.2d 545 (1987).

alty, and thus a conflict of interest, to represent the petitioner in the Waterbury judicial district because of the risk that the potential jurors would know of Avcollie's murder conviction and hold it against the petitioner.[13] The court concluded that "[t]he petitioner's

Of course, even where a trial court *finds* a waiver of a constitutional right, that finding is subject to "a scrupulous examination" by us in order to determine that it is supported by substantial evidence. Id., 268. The dissent, nonetheless, would disregard the respondent's disclaimer and the necessity for such special scrutiny and would find waiver as a matter of law in a record where the issue was never presented, litigated or argued by the parties and where, therefore, no such finding was ever made.

[13] In the habeas court, the petitioner had presented the expert testimony of attorney Richard R. Brown, of Hartford, a former assistant attorney general, former assistant state's attorney, former chair of the criminal justice section of the Connecticut Bar Association, and currently a criminal defense attorney in private practice. The habeas court recognized Brown as an expert witness on matters of conflicts in interest in criminal representation.

Brown testified, inter alia, that it was a breach of Avcollie's duty of undivided loyalty to the petitioner to represent him at his trial because there was a conflict of interest inherent in the situation. Asked to explain his opinion by putting himself hypothetically in Avcollie's position, he testified as follows: " I . . . [have] been convicted, myself, of a violent crime, to wit, murder. I'm representing someone who is charged with a heinous violent crime, to wit, rape. That jury has to rely upon my integrity. I'm now a convicted felon. It is my opinion, based upon my years of experience, there is without question a spill-over effect—that is, for better or for worse as defense lawyers [we] are sometimes associated with the defendant in terms of what they think of the lawyer—it spills over onto the defendant. . . . If I have the stigma of being a convicted murderer, I have to believe in my experience, that that would have a substantial effect [on the jury] . . . ."

He also testified that in this situation it was incumbent on Avcollie, having nonetheless continued to represent the petitioner despite the violation of his duty to withdraw, to request the trial court for an expanded individual voir dire in order "to insure that all prospective jurors could honestly separate [his] problems and [his] history from those of [his] client and would not transfer any feelings they may have [had] about [him], nor let any felony convictions they may have [had] about [him], spill over to those . . . feelings that they might have . . . [regarding] the evidence against [his] client." He testified further that Avcollie's general introductory remarks to the jury panel were inadequate to bring to the surface those potential jurors "who may not even be aware of their prejudice until it's brought to their attention by way of various indepth questioning," and that those

bald assertions as to the situs of the trial do not substantiate his claim of conflict of interest. Avcollie was in an adversarial relation with the Waterbury prosecutor's office in both cases. The petitioner makes no claim that Avcollie compromised the petitioner's defense either to advance Avcollie's own defense, or in an attempt to gain, in any other way, at the petitioner's expense." Id., 71.

The Appellate Court also rejected the petitioner's claim that Avcollie was required to conduct an individual voir dire to discover the extent of the jurors' knowledge of his conviction. The court reasoned that this was a reasonable strategic choice "to protect the interests of the petitioner by not planting the seeds of prejudice where none existed." Id.[14]

With this background in mind, we turn to the petitioner's principal claim on this appeal, namely, that

remarks were not an adequate substitute for an individual voir dire that was required under the circumstance of the case to guard against the risks he had outlined.

The respondent presented the expert testimony of attorney Louis S. Avitabile, an experienced criminal defense lawyer from Waterbury, who since 1971 had been under contract with the public defender's office for cases in which it is necessary to decide whether an attorney other than a public defender is needed and who has testified as an expert regarding the issue of effective assistance of counsel. Avitabile testified that Avcollie's personal situation did not constitute a conflict of interest, and that as long as Avcollie explained that situation to the petitioner, "if his client wants to hire him then that's between him and his client at that point." He also testified that the decision whether to discuss Avcollie's status as a convicted murderer with the potential jurors in individual voir dire, or to confine the issue to general remarks addressed to the entire venire, was a strategic choice that had "pros and cons in both situations." He agreed that questioning jurors individually on the subject could have "plant[ed] seeds of prejudice where they may or may not exist in a juror's mind."

[14] The Appellate Court did agree with the petitioner, however, that the habeas court had applied an improper standard in requiring the petitioner to show actual bias on the part of petitioner's jurors. "We agree that here, without having conducted a line of questioning during individual voir dire to ferret out potential bias, it is impossible now to prove actual bias." *Phillips* v. *Warden,* 23 Conn. App. 63, 71 n.5, 579 A.2d 1092 (1990).

Avcollie violated the petitioner's sixth amendment[15] right to the undivided loyalty of his attorney by representing the petitioner at his trial because Avcollie's well publicized murder conviction jeopardized the petitioner's right to a fair trial before an unbiased jury. We agree.

We first consider our scope of review. Although the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous, whether those facts constituted a violation of the petitioner's rights under the sixth amendment "is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case." *Cuyler* v. *Sullivan,* 446 U.S. 335, 342, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). As such, that question requires plenary review by this court unfettered by the "clearly erroneous" standard. Id.; see also *Mannhalt* v. *Reed,* 847 F.2d 576, 579 (9th Cir.), cert. denied, 488 U.S. 908, 109 S. Ct. 260, 102 L. Ed. 2d 249 (1988); *Government of the Virgin Islands* v. *Zepp,* 748 F.2d 125, 134 (3d Cir. 1984). Indeed, we have applied that scope of review, without specifically articulating it, to claims of ineffective assistance of counsel. See *Johnson* v. *Commissioner,* 218 Conn. 403, 423–29, 589 A.2d 1214 (1991); *Siemon* v. *Stoughton,* 184

---

[15] The petitioner couches his claim entirely in sixth amendment terms and makes no separate claim under the Connecticut constitution. Although we have, in the context of the right to the effective assistance of counsel, stated that "the state and federal constitutional standards for review of ineffective assistance of counsel claims are identical"; *Aillon* v. *Meachum,* 211 Conn. 352, 355–56 n.3, 559 A.2d 206 (1989); we have more often and recently insisted on a separate and independent analysis of our state criminal constitutional provisions. See, e.g., *State* v. *Steiger,* 218 Conn. 349, 358 n.9, 590 A.2d 408 (1991); *State* v. *Mooney,* 218 Conn. 85, 89, 588 A.2d 145 (1991); *State* v. *Mercer,* 208 Conn. 52, 67 n.9, 544 A.2d 611 (1988). Therefore, in the absence of any such analysis by the petitioner in this case, we confine our discussion to his rights under the sixth and fourteenth amendments.

Conn. 547, 440 A.2d 210 (1981). In accordance with this scope of review, we next consider the merits of the petitioner's claim.

It is axiomatic that " 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland* v. *Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984), quoting *McCann* v. *Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970). "As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. *Wood* v. *Georgia,* 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *Glasser* v. *United States,* 315 U.S. 60, 70, 62 S. Ct. 457, 86 L. Ed. 2d 680 (1942); *State* v. *Martin,* 201 Conn. 74, 78, 513 A.2d 116 (1986); *Festo* v. *Luckart,* [supra, 626–27]." *State* v. *Williams,* 203 Conn. 159, 166–67, 523 A.2d 1284 (1987).

Different standards apply to different types of claims of ineffective assistance of counsel. Where the criminal defendant presents a claim of " 'actual ineffectiveness' "; *Strickland* v. *Washington,* supra, 686; that is, when he challenges his lawyer's performance in the trial court, he must show that: (1) his "counsel's performance was deficient" in the sense that the counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and (2) the "deficient performance prejudiced the defense"; id., 687; in the sense "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., 694. In such a case, therefore, the defendant must establish (1) deficient performance, and (2) actual prejudice.

Where, however, the defendant claims that his counsel was "burdened by an actual conflict of interest";

id., 692; the defendant need not establish actual prejudice. Id. Where there is an actual conflict of interest, prejudice is presumed because "counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." Id. In a case of a claimed conflict of interest, therefore, in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) "that counsel 'actively represented conflicting interests'" and (2) that "'an actual conflict of interest adversely affected his lawyer's performance.'" Id., quoting *Cuyler* v. *Sullivan,* supra, 350; see also *Burger* v. *Kemp,* 483 U.S. 776, 783, 107 S. Ct. 3114, 97 L. Ed. 2d 638, reh. denied, 483 U.S. 1056, 108 S. Ct. 32, 97 L. Ed. 2d 820 (1987); *State* v. *Rodriquez,* 200 Conn. 685, 696, 513 A.2d 71 (1986).[16]

Although different standards of prejudice apply to these different types of claims, certain principles under-

---

[16] Thus, the dissent's conclusion that the petitioner did not establish actual prejudice, because he did not prove actual bias on the part of any of his jurors, is simply beside the point. In a conflict of interest case, prejudice is presumed precisely because it is impossible "to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland* v. *Washington,* 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Equally unpersuasive is the dissent's complaint that we are engaging in prohibited "appellate second-guessing." The admonitions that the dissent quotes from *Strickland* v. *Washington,* supra, 690-91, were issued in the context of a case involving a claim of an attorney's actual ineffectiveness in the performance of a trial, not a case involving a claimed conflict of interest, and were premised largely on considerations involving the necessity to make reasonable strategic choices that are inapplicable to Avcollie's choice in this case to continue his representation of the petitioner.

In this case, moreover, even if we were to afford Avcollie an initial "strong presumption" of "reasonable professional assistance"; id., 689; that presumption would quickly disappear in the glare of the facts disclosed by this record. We do not second-guess, nor is our view distorted by hindsight. Rather, we reach a set of conclusions that are compelled by the undisputed facts of this case.

lie both. The fundamental purpose of the constitutional requirement of effective assistance of counsel is "to ensure that the trial is fair." *Strickland* v. *Washington,* supra, 685. The "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Id., 696. Furthermore, since fundamental fairness is the central concern, "no special standards ought to apply to ineffectiveness claims made in habeas corpus proceedings"; id., 698; as opposed to proceedings on direct appeal.[17] Moreover, a court judging a claim of ineffective assistance of counsel must do so "on the facts of the particular case, viewed as of the time of counsel's conduct." Id., 690. Thus, whether counsel's conduct violated the sixth amendment is a peculiarly fact-bound inquiry. See id., 690; *Wood* v. *Georgia,* supra, 267; *Siemon* v. *Stoughton,* supra, 555. For purposes of that inquiry, moreover, "[p]revailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ('The Defense Function'), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland* v. *Washington,* supra, 688–89.

"While the right to conflict-free representation typically is implicated in cases involving representation of criminal codefendants by a single attorney; see, e.g., *Holloway* v. *Arkansas,* 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); G. Lowenthal, 'Joint Repre-

---

[17] Indeed, we have held that claims of ineffective assistance of counsel should be confined to habeas corpus proceedings, where an adequate record may be made. *State* v. *Leecan,* 198 Conn. 517, 541, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

sentation in Criminal Cases: A Critical Appraisal,' 64 Va. L. Rev. 939 (1978); it is equally applicable in other cases where a conflict of interest may impair an attorney's ability to represent his client effectively." *State* v. *Williams,* supra; *State* v. *Martin,* supra, 80–81 (defendant's attorney represented person implicated by testimony of state's witness); see also *Wood* v. *Georgia,* supra (defendants' attorney paid by defendants' employer); *Mannhalt* v. *Reed,* supra (defendants' attorney accused of criminal conduct by state's witness during cross-examination); *United States* v. *McLain,* 823 F.2d 1457 (11th Cir. 1987) (defendant's attorney under indictment for unrelated federal offense); *United States* v. *Iorizzo,* 786 F.2d 52 (2d Cir. 1986) (defendant's attorney had represented government's witness in prior related administrative proceedings); *Government of the Virgin Islands* v. *Zepp,* supra (defendant's attorney subject to possible criminal liability for same transaction, and entered into factual stipulation, based on own knowledge, adverse to defendant); *United States* v. *Winkle,* 722 F.2d 605 (10th Cir. 1983); *United States* v. *DeFalco,* 644 F.2d 132 (3d Cir. 1979) (while defendant's appeal pending, defendant's appellate attorney under indictment and had entered guilty plea in same federal district court); *United States* v. *Hearst,* 638 F.2d 1190 (9th Cir. 1980), cert. denied, 451 U.S. 938, 101 S. Ct. 2018, 68 L. Ed. 2d 325 (1981) (defendant's attorney under contract to publish book regarding defendant's trial); *State* v. *Bolen,* 514 So. 2d 691 (La. App. 1987) (defendant's attorney was son of trial court judge); *Nunn* v. *State,* 778 S.W.2d 707 (Mo. App. 1989) (defendant's attorney became defense witness to impeach credibility of state's witness).

In the context of representation of multiple codefendants by one attorney, we have defined a conflict of interest as existing where the attorney adduces evidence or advances arguments on behalf of one defendant that

are damaging to the interests of the other defendant. See *Festo* v. *Luckart,* 191 Conn. 622, 631, 469 A.2d 1181 (1983). Although that definition does not directly address a case such as this case, where there are no differing interests of codefendants, the fundamental principle underlying the right to conflict-free representation is directly applicable to this case. That fundamental principle is that an attorney owes an overarching duty of undivided loyalty to his client.[18] At the core of the sixth amendment guarantee of effective assistance of counsel is loyalty, "perhaps the most basic of counsel's duties." *Strickland* v. *Washington,* supra, 692; see

[18] The dissent argues that because "a divergence of competing motives is the heart or essence of a conflict of interest claim," there was no constitutional conflict of interest in this case. We disagree for two related reasons.

First, that position is derived from the dissent's adoption of a definition of a conflict of interest as existing " 'when, in behalf of one client, it is [a lawyer's] duty to contend for that which duty to another client requires him to oppose.' [ABA Code of Professional Responsibility, Canon 6]." *Cuyler* v. *Sullivan,* 446 U.S. 335, 356 n.3, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). That definition was formulated by Justice Marshall dissenting in *Cuyler,* and was not adopted by the majority. It was specifically tailored, moreover, to the facts of *Cuyler,* which was a case of representation of multiple codefendants. Furthermore, Justice Marshall prefaced his adoption of the definition by stating: " 'Conflict of interests' is a term that is often used and seldom defined. The American Bar Association's usage . . . is a fair statement of what is *ordinarily* meant by the term, and it is that meaning that I adopt *here.*" (Emphasis added.) Id. After noting its applicability to a case of multiple representation, he acknowledged that "[t]he ABA materials do not, of course, define the constitutional standard." Id.

Second, the dissent's limited perception of when a conflict of interest may occur ignores the basic principle of loyalty to client that undergirds the sixth amendment prohibition against actual conflicts of interest. The dissent does not take issue, however, with our analysis, or with the case law on which it is based, that underlying the rules against conflicts of interest is the duty of loyalty. Thus, even though an attorney may have violated that constitutional duty of loyalty, the dissent would condone it unless the violation was committed in the service of some competing motive of the attorney. We do not believe that the notion of a conflict of interest in the constitutional sense should be divorced from the fundamental principle underlying the sixth amendment guarantee that conflict of interest rules are designed to implement.

also *Cuyler* v. *Sullivan,* supra, 356 (Marshall, J., dissenting). "Loyalty of a lawyer to his client's cause is the *sine qua non* of the Sixth Amendment's guarantee that an accused is entitled to effective assistance of counsel." *United States* v. *Aiello,* 814 F.2d 109 (2d Cir. 1987). That guarantee affords a defendant "the right to counsel's undivided loyalty." *Mannhalt* v. *Reed,* supra, 579; see also *Fitzpatrick* v. *McCormick,* 869 F.2d 1247, 1251 (9th Cir.), cert. denied, 493 U.S. 872, 110 S. Ct. 203, 107 L. Ed. 2d 156 (1989) (right to effective assistance of counsel premised on "right to counsel's undivided loyalty"); *United States* v. *McLain,* supra, 1464 (Model Code of Professional Responsibility EC 5-2 [1987] prohibits a lawyer from accepting employment if there is reasonable possibility that his personal interests or desires will adversely affect advice or services to be rendered); *Government of the Virgin Islands* v. *Zepp,* supra, 135 (Model Code of Professional Responsibility proscribes conflicts of interest in "order to avoid interference with counsel's fiduciary duty to maintain undivided loyalty"); *Dukes* v. *Warden,* 161 Conn. 337, 345–46, 288 A.2d 58 (1971), aff'd, 406 U.S. 250, 92 S. Ct. 1551, 32 L. Ed. 2d 45, reh. denied, 407 U.S. 934, 92 S. Ct. 2464, 32 L. Ed. 2d 817 (1972) (client entitled to "undivided loyalty of the one upon whom he looks as his advocate and his champion").

This requirement of loyalty carries with it the correlative duty of exercising independent professional judgment on the client's behalf, and both those duties are also reflected in the relevant disciplinary guidelines. "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." Code of Professional Responsibility DR 5-101 (A). Similarly, DR 5-105 (A) of the Code of Professional Responsibil-

ity provides in pertinent part that "[a] lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment . . . ." "A lawyer shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interests . . . ." Rules of Professional Conduct 1.7 (b). The comments to Rule 1.7 reinforce these ethical precepts. They state, in relevant part: that "[l]oyalty is an essential element in the lawyer's relationship to a client"; that such loyalty is "impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests"; and that "[t]he lawyer's own interests should not be permitted to have adverse effect on representation of a client."

These references to a lawyer's "interests" are not confined, however, to those financial or personal interests that are extrinsic to the case at hand. They may, under appropriate circumstances, include situations where the intrinsic situation of the lawyer, when viewed in the context of his client's cause, requires that he withdraw from representing the client because of the impermissible risk that the jury will identify his conduct with that of his client. Thus, in *United States* v. *Iorizzo,* 786 F.2d 52 (2d Cir. 1986), the court identified a conflict of interest in the likelihood of the jury's identification of the defendant's lawyer with the government's witness whom the lawyer had represented at prior, related administrative proceedings. "Because [the witness'] prior statements had been made at a time when defense counsel was representing him, the prior testimony could not be used to attack [the witness'] credibility without putting defense counsel's role before the State Tax Commission in issue." Id., 57. Similarly, in *Nunn* v. *State,* supra, the court found a conflict

of interest where the defendant's lawyer sought to impeach the credibility of a state's witness by use of a statement that he had typed without the witness' knowledge, and where the lawyer then called another witness to bolster his own credibility. The court reasoned: "The only issue which should have been before the jury was [the] defendant's conduct, not that of his attorney. . . . Counsel's prior conduct was completely irrelevant to [the defendant's] case and could only detract from his defense. That the jury unintentionally imputed the alleged improprieties of defense counsel to his client is a very real possibility." Id., 711. Thus, an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are "inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." *Government of the Virgin Islands* v. *Zepp*, 748 F.2d 125, 135 (3d Cir. 1984).

Application of these principles to the unique facts of this case requires us to conclude that the petitioner was denied his right to the effective assistance of counsel. Although Avcollie may not have had a conflict of interest in the classic sense of separate clashing interests, there was a conflict of interest in the constitutional sense because of his violation of the fundamental principles underlying the notion of a conflict of interest and the sixth amendment guarantee of effective assistance of counsel. Avcollie's representation of the petitioner was fatally flawed by an inherent conflict of interest because Avcollie's duties of undivided loyalty and independent exercise of professional judgment demanded that he withdraw from representing the petitioner on the serious charges that the petitioner faced in that place and at that time. Moreover, that conflict of interest adversely affected Avcollie's performance as the petitioner's lawyer because, as a direct result of his vio-

lation of those duties, Avcollie was required to make the tactical choice of choosing between two options—inquiring of the venirepersons during individual voir dire whether they knew about his murder conviction, or forgoing such inquiry—either of which was fraught with peril for the petitioner's right to a fair trial before an impartial jury, and because the course he chose of forgoing the inquiry created a significant risk of a jury biased against his client.

Certain facts bear repeating. Avcollie had been a prominent figure in the Waterbury area for many years. His indictment, trial and conviction, and the ensuing appeals by the state and by him, had been the subject of widespread publicity in that area from November, 1975, when Avcollie was convicted, through April, 1983, when the petitioner was found guilty by a jury that had been exposed to that very same publicity. Indeed, both Avcollie and his attorneys, as well as the state's attorney, had deemed special measures to be necessary in order to protect Avcollie's right to a fair trial from being impaired by that prejudicial publicity. Moreover, Avcollie had been convicted of murdering his wife by strangling her to death, a crime of violence of the first order of seriousness, and the petitioner was charged with the crimes of sexual assault, unlawful restraint and burglary, arising out of a factual scenario of terrible violence against an elderly woman. Furthermore, Avcollie believed that most of the venirepersons knew of his murder conviction.

Surely no other criminal defendant in the history of Connecticut jurisprudence—indeed, in the history of American jurisprudence—has ever had to face a jury in a trial for serious and violent criminal offenses, while represented by a convicted murderer, whose conviction was likely to have been known by the jurors, in the judicial district where both the murder and conviction took place, where both the murder and its ensu-

ing legal aftermath had been widely reported in the press, and when the murderer was literally on his own way to prison.[19] Surely, no other attorney in the history of Connecticut or American jurisprudence has ever brought with him to the criminal jury courtroom the potential for prejudice to his client that Avcollie brought to the Waterbury courtroom in April, 1983. Under these unique factual circumstances, we are constrained to conclude that there was a constitutionally impermissible risk that the petitioner's jurors would identify Avcollie's status as a convicted murderer with his client's status as an accused rapist, kidnapper and burglar, and that they would transfer to the petitioner the distaste or revulsion that they may have felt for his lawyer.

We cannot blind ourselves to the real and substantial risk that one or more of the petitioner's jurors may well have known of Avcollie's murder conviction and viewed the petitioner's defense through a lens corrupted by that knowledge. Avcollie believed that risk to be a reality. That risk, which was all too apparent to Avcollie from the very beginning and which persisted throughout the proceedings, demanded no less than that Avcollie, burdened as he was by his own well publicized murder conviction, simply refrain from representing the petitioner before a Waterbury jury in April, 1983. *United States* v. *Iorizzo,* supra. "The only issue which should have been before the jury was [the petitioner's] conduct, not that of his attorney." *Nunn* v. *State,* 778 W.2d 707, 711 (Mo. App. 1989). There was an impermissible risk that the jurors would "uninten-

---

[19] Like the habeas court and the parties to this appeal, we have found no other case where a convicted murderer was permitted to practice law by representing a client accused of serious criminal offenses. Unsurprisingly, such conduct has been uniformly considered grounds for disbarment. See *Ex parte Wall,* 107 U.S. 265, 2 S. Ct. 569, 27 L. Ed. 552 (1882); *In re McAlesher,* 93 N.J. 486, 461 A.2d 1122 (1983); annot., 21 A.L.R.3d 887.

tionally [impute] the . . . improprieties of defense counsel to his client . . . ." Id.

Furthermore, an independent attorney, exercising his reasonable professional judgment, would have counseled the petitioner strongly against permitting Avcollie to represent him on such serious criminal charges at that place and time. The petitioner was entitled to no less from Avcollie.

Thus, Avcollie's fiduciary duties to give undivided loyalty to the petitioner and to exercise independent professional judgment on the petitioner's behalf required that he withdraw from representing the petitioner on those charges. His failure to do so was "inconsistent, diverse or otherwise discordant with [the interests] of his client." *Government of the Virgin Islands* v. *Zepp,* supra, 135. Under these circumstances, therefore, the "fundamental fairness of the proceeding" was impaired by Avcollie's representation of the petitioner. See *Strickland* v. *Washington,* supra.

The respondent argues that there was no conflict of interest because the petitioner's claim is "in actuality, simply a claim that Avcollie could not effectively represent him because of Avcollie's status as a convicted felon." Thus, the respondent asserts, "a jury's knowledge of defense counsel's criminal conviction no more implicates conflict of interest concerns than would a jury's belief that defense counsel is not doing a very good job." We reject this argument for two reasons.

First, it is premised on an unduly cramped notion of when a criminal attorney is laboring under a conflict of interest because it ignores the principle that conflict of interest rules are designed to implement and protect the client's constitutional entitlement to his lawyer's undivided loyalty and independent professional judgment. Second, it trivializes the enormity of the facts of this case. We do not hold that whenever a law-

yer who has been convicted of a felony represents a criminal defendant there is a conflict of interest in the constitutional sense. We can hardly equate, however, Avcollie's murder conviction in that judicial district with any other criminal conviction, nor can we equate the likelihood of the petitioner's jury's knowledge of that conviction with some other jury's belief that defense counsel is not doing a very good job.

The respondent also argues that, even if the issue is properly analyzed in conflict of interest terms, there was no such conflict because there was no proof that Avcollie had anything to gain by following a course of conduct detrimental to the petitioner's interest, because their respective interests merged since they both desired an acquittal, because there was no overwhelming danger that Avcollie's stigma as a convicted murderer weakened his ability to represent the petitioner, and because we should not presume that the petitioner's jurors were aware of Avcollie's conviction or, if they were, that they could not remain unbiased nonetheless. Therefore, the respondent argues, the Appellate Court was correct in concluding that there was no conflict of interest because there was no proof that Avcollie stood "to gain significantly by adducing evidence, advancing arguments or engaging in conduct that [was] detrimental to the interests of" the petitioner. *Phillips* v. *Warden,* supra, 23 Conn. App. 69. These arguments are equally unpersuasive.

Although the petitioner did not establish a conflict of interest within the Appellate Court's definition of that term, that definition was drawn from cases involving representation of multiple criminal defendants, and does not address the underlying violation of the duties of loyalty and exercise of independent professional judgment present in this case. Furthermore, there is no requirement that, in order for there to be a conflict of interest, the habeas corpus petitioner show that his

lawyer desired his conviction. As the petitioner aptly points out, it is not necessary to prove that Avcollie was a quisling[20] in order to establish a conflict of interest under the sixth amendment.[21] Finally, we need not, and do not, presume that any one of the petitioner's jurors was actually biased against him because of Avcollie's murder conviction. *Cuyler* v. *Sullivan,* 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), does not mandate such an impossible showing. We hold only that the risk of such bias was so significant that Avcollie's duties to the petitioner mandated that he withdraw in order to avoid that risk.

This violation of Avcollie's duty of loyalty to the petitioner adversely affected Avcollie's performance as the petitioner's lawyer. Having opted to remain as the petitioner's lawyer in violation of his duty to withdraw, Avcollie was faced with the insoluble dilemma of whether to raise the fact of his own notorious conviction during the individual voir dire, in order to ferret out those venirepersons who harbored hostility toward him and who would transfer that hostility to his client. This was, from the petitioner's viewpoint, a classic "no win" situation. If Avcollie did not raise the issue, he exposed his client to the risk that such biased venirepersons would find their way on to the jury. If he did raise the issue, he created the risk that he would inform—or remind—otherwise ignorant or forgetful venirepersons that they were to hear a case in which a convicted

[20] Vidkun Quisling (d. 1945) was a Norwegian politician who betrayed his nation and served as puppet governor of Norway under the protection of the occupying Nazi regime during World War II. Thus, "quisling" has entered our lexicon as a synonym for traitor. See 16 The World Book Encyclopedia (1990 Ed.).

[21] The dissent, by concluding that there was no conflict of interest because both Avcollie and the petitioner desired an acquittal, endorses this bizarre view of a conflict of interest. Neither the cases involving conflicts of interest nor the principles of the sixth amendment suggest such an extreme requirement.

murderer would be representing an accused rapist. Either choice was harmful to the petitioner's interest, because either course of conduct created the impermissible risk that the jurors who were to judge the petitioner would do so infected by their view of Avcollie.

No other lawyer would have imposed that unique danger on his client solely by his presence at his client's side. This dilemma was inherent in Avcollie's personal situation, and was the inevitable result of the violation of his duty of loyalty to the petitioner. Thus, we can only conclude that, by his forgoing individual voir dire on this issue, Avcollie's performance was adversely affected by his conflict of interest. *Cuyler* v. *Sullivan,* supra.

This conclusion is reinforced by reference to the unique role that individual voir dire plays in Connecticut. Article first, § 19, of our constitution, as amended by article IV of the amendments thereto, provides in pertinent part that "[t]he right to question each juror individually by counsel shall be inviolate."[22] That constitutional right is implemented further in criminal cases by General Statutes § 54-82f,[23] which guarantees

---

[22] The constitution of Connecticut, article first, § 19, as amended by article IV of the amendments in 1972, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

We have recently noted that "[t]he provisions concerning peremptory challenges and the individual voir dire appear to be unique to Connecticut's constitution. Our search of the constitutions of our forty-nine sister states revealed no similar constitutionalization of rights regarding the procedure of jury selection." *Rozbicki* v. *Huybrechts,* 218 Conn. 386, 392 n.2, 589 A.2d 363 (1991).

[23] General Statutes § 54-82f provides: "VOIR DIRE EXAMINATION. In any criminal action tried before a jury, either party shall have the right to exam-

"either party . . . the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto." One of the principal purposes of individual voir dire is the discovery of factors "that may predispose a prospective juror to decide a case on legally irrelevant grounds"; *Rozbicki* v. *Huybrechts*, 218 Conn. 386, 391, 589 A.2d 363 (1991); and thus provide a basis for a challenge for cause or for a peremptory challenge. Other cases reinforce the particular importance that our law places on the individual voir dire. Id., 390; *State* v. *Fritz*, 204 Conn. 156, 161, 527 A.2d 1157 (1987); *State* v. *Dolphin*, 203 Conn. 506, 511, 525 A.2d 509 (1987); *Lamb* v. *Burns*, 202 Conn. 158, 162, 520 A.2d 190 (1987); *State* v. *Hill*, 196 Conn. 667, 671–72, 495 A.2d 699 (1985). Avcollie, at the petitioner's expense, dispensed with this unique and valuable right. That course of inaction by Avcollie constituted an adverse effect on his performance that was the direct result of his conflict of interest. *Cuyler* v. *Sullivan*, supra, 344.

The respondent argues that there was no adverse effect on Avcollie's performance because "Avcollie reasonably concluded that the potential harm to the petitioner in informing previously unaware jurors of Avcollie's situation outweighed the potential benefit in

ine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring the questions to be put to any juror in writing and submitted in advance of the commencement of said action."

detecting jurors who were already aware of his situation and could not remain unbiased." Thus, the respondent contends, Avcollie made a reasonable "strategic choice . . . to protect the petitioner's interests in not 'planting the seeds of prejudice' where none may [have existed]." We disagree.

It is not clear from this record, and the habeas court did not find, that strategic considerations rather than personal reluctance dictated Avcollie's decision to forgo individual voir dire about his own murder conviction. See footnote 10, supra. Assuming, however, that strategy was the predominating motive, we nonetheless reject the respondent's argument.

It was only because of Avcollie's antecedent violation of his constitutional and ethical duties to the petitioner that he was confronted with a strategic choice that carried with it only adverse consequences for his client. That strategic dilemma was dictated solely by Avcollie's own personal situation. No other lawyer would have been required to sacrifice his client's interests by making a strategic decision that threatened to harm those interests no matter which fork in the road he took. Under these circumstances, the petitioner cannot be charged with the consequences of a strategy that was born, not of his misconduct, but of the misconduct of his lawyer.

The judgment is reversed and the case is remanded to the Appellate Court with direction to remand the matter to the Superior Court with direction to render judgment granting the writ of habeas corpus and ordering a new trial for the petitioner.

In this opinion SHEA and GLASS, Js., concurred.

COVELLO, J., with whom F. X. HENNESSY, J., joins, dissenting. The majority concludes that the petitioner

has been denied the effective assistance of counsel. I disagree. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal . . . has two components. First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. . . . Unless a defendant makes both showings, it cannot be said that [counsel's assistance has been ineffective]." *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984).

In the context of ineffective assistance of counsel claims based upon conflicts of interest, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial, [which was the case here,] must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance." (Emphasis added.) *Cuyler* v. *Sullivan,* 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

A conflict of interest occurs in situations where " 'it would be likely to involve [the lawyer] in representing differing interests' . . . . ABA Code of Professional Responsibility, Disciplinary Rule 5-105 (A)–(B) (1976). . . . '[A] lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.' [ABA Code of Professional Responsibility, Canon 6]." *Cuyler* v. *Sullivan,* supra, 356 n.3. Thus, a divergence of competing motives is the heart or essence of a conflict of interest claim.

An *actual* conflict of interest occurs upon proof, as opposed to hypothesis, that counsel's behavior is motivated out of a "desire to diminish the jury's perception of a codefendant's guilt . . . [so that] . . . counsel's 'struggle to serve two masters [could not] seriously be

doubted.' " *Glasser* v. *United States,* 315 U.S. 60, 75, 62 S. Ct. 457, 86 L. Ed. 680 (1942) (Frankfurter, J., dissenting); *Cuyler* v. *Sullivan,* 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). "[U]ntil a defendant shows that his counsel *actively represented conflicting interests,* he has not established the constitutional predicate for his claim of ineffective assistance. . . . [T]he *possibility of conflict* is insufficient to impugn a criminal conviction." (Emphasis added.) *Cuyler* v. *Sullivan,* supra, 350.

In the present case, "there was no conflict of interest between the petitioner and Avcollie. To the contrary, their interests converged at all times [in seeking] the ultimate goal of acquittal . . . ." *Phillips* v. *Warden,* 23 Conn. App. 63, 70, 579 A.2d 1092 (1990). As the habeas court correctly observed, "the interest of Avcollie and that of the petitioner [neither conflicted nor diverged] but rather they converged in that each wanted to obtain a not guilty verdict."

Further, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . [P]rejudice is presumed when counsel is burdened by an *actual* conflict of interest. . . . Prejudice is presumed only if the defendant *demonstrates* that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' *Cuyler* v. *Sullivan,* [446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)]." (Emphasis added.) *Strickland* v. *Washington,* 466 U.S. 668, 691–92, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984). Since, as the majority concedes, the petitioner's attorney did "not have . . . a conflict of interest in the classic sense of separate clashing interests . . ." there is no presumption of prejudice that would satisfy the second require-

ment of the *Strickland* test. Having failed to demonstrate an *actual* conflict of interest and thus being unable to rely on the presumption of prejudice, the majority seeks to craft an entirely new definition of actual conflict of interest based upon an assumption of divided loyalty based in turn upon the possibility of jury prejudice. Intriguing as this definition is, no court has ever adopted it.

Although the majority would not require that actual bias be present, only a significant risk of bias on the part of jurors, the habeas court found that "[i]n this case there was no evidence presented that any of the jurors sitting on the petitioner's case harbored any hostility toward Attorney Avcollie that would prevent such juror from judging the case fairly and impartially." Without having questioned the jurors during individual voir dire, or as an incident to the habeas hearing, it is impossible now to prove actual bias.

Further, the majority overlooks completely the significance of the petitioner's waiver of counsel's disability. "A valid waiver is defined . . . as the intentional relinquishment or abandonment of a known right or privilege." *In re Manuel R.*, 207 Conn. 725, 736, 543 A.2d 719 (1988); see also *State* v. *Gethers*, 193 Conn. 526, 532, 480 A.2d 435 (1984).

Examination of the record reveals that sometime shortly after September 11, 1982, the petitioner learned that Avcollie had been convicted of murder. Despite this, he elected to proceed with Avcollie as counsel. On January 20, 1983, some four months later, Avcollie himself explained his conviction to the petitioner *and discussed with him his concerns that his own problems could affect the jury's attitude toward the petitioner.*[1]

---

[1] The petitioner has never claimed that he did not understand that Avcollie's representation might adversely affect the jury's perception of him (the petitioner).

Despite these clear admonitions, the petitioner again elected to continue with Avcollie's representation at trial, a trial that began some two months later.

It is important to note that a tension exists between the constitutional right to the effective assistance of counsel and the limited right to counsel of one's choice. This tension is resolved, in part, through the law of waiver. Our rules of practice, for example, allow an accused to refuse the assistance of counsel entirely and represent himself providing the trial court finds an effective waiver of the right to counsel. See Practice Book § 961. Further, the Code of Professional Responsibility, in force at the time of this trial, permitted counsel with an actual conflict of interest, to continue to represent a client provided there was full disclosure of the conflict and a knowing waiver by the client.[2]

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . and it is all too easy for a court . . . to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct . . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland* v. *Washington,* 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984).

---

[2] Disciplinary Rule 5-101 (A) of the ABA Model Code of Professional Responsibility in effect at the time of the petitioner's trial, provided: "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests." See also Rules of Professional Conduct § 1.7 et seq.

Despite its clear admonition to the contrary, the majority has done exactly what the *Strickland* court tells us not to do. In a classic case of appellate second guessing, having made no "effort . . . to eliminate the distorting effects of hindsight," and having cast aside the "strong presumption that counsel's conduct . . . [was effective]"; *Strickland* v. *Washington*, supra; the majority has redetermined the facts and rendered a judgment that is without legal precedent.

Since there has been: (1) no demonstration of an actual conflict of interest; and (2) no evidence of prejudice caused by the presumed conflict of interest, I conclude that the petitioner has not met his burden of establishing a violation of the sixth amendment under the *Strickland* test. Further, even were there a conflict of interest, the record clearly demonstrates a voluntary and knowing waiver of its ramifications by the petitioner. Accordingly, I dissent.