In re Application of Bernard F. Avcollie

Superior Court      Judicial District of Waterbury

Memorandum filed July 14, 1993

*Moynahan, Ruskin & Mascolo,* for the applicant.

PELLEGRINO, SPADA and WAGNER, JS. The dispositive issue before this panel, raised by an application for reinstatement to the bar, pursuant to Practice Book § 36, is whether the applicant is presently fit to exercise the privileges and functions of an attorney, as an officer of the court, and as a confidential manager of the affairs and business of others entrusted to his care. The panel answers in the negative.

In resolving this issue, the panel could reasonably and logically conclude that the reasons given by the standing committee on recommendations for admission to the Connecticut bar (committee) to support its recommendation that the application be denied were not without merit and substance. *In re Application of Koenig,* 152 Conn. 125, 204 A.2d 33 (1964); *Pharr v. Standing Committee on Recommendations to the Bar,* 32 Conn. Sup. 183, 346 A.2d 115 (1975).

The record discloses the following relevant facts. The applicant's wife was murdered on October 29, 1975, by strangulation; her body was discovered in the family swimming pool. On November 21, 1975, the applicant was indicted for her murder. On July 21, 1977, a jury found the applicant guilty of the crime of murder. The jury verdict was set aside and a judgment of acquittal was rendered by the trial judge. The Supreme Court reversed the trial court's judgment and reinstated the jury verdict. *State v. Avcollie,* 178 Conn. 450, 423 A.2d

118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980). In a subsequent appeal of the judgment on the jury verdict, the Supreme Court found that "there was sufficient evidence to permit the jury to find the defendant guilty beyond a reasonable doubt." *State* v. *Avcollie*, 188 Conn. 626, 628, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983).

The applicant was sentenced to the state prison in Somers for a minimum term of eighteen years to life. He entered prison on June 23, 1983, and on April 11, 1989, was released on parole. On October 5, 1987, his sentence was commuted to twelve years to life imprisonment. The applicant served approximately sixty-nine months in the state prison system.

On February 13, 1985, the applicant, in response to a presentment for disbarment, stipulated to a voluntary suspension of his right to practice law. On June 25, 1990, the applicant was disbarred, in an uncontested presentment, by the Superior Court for the judicial district of Waterbury. On May 30, 1991, the applicant filed an application for reinstatement to practice law pursuant to Practice Book § 36.

The application was referred to the committee. On September 23, 1991, a hearing was conducted. On September 22, 1992, the committee issued its report recommending that the application be denied. On January 5, 1993, Chief Justice Ellen A. Peters appointed this panel to determine whether the application should be granted. Practice Book § 36. A hearing was conducted, pursuant to the appointment on February 18, 1993.

During 1989 and 1990, the applicant was employed in realty and car care businesses. From April, 1990, to October, 1992, the applicant was office manager for the law offices of Moynahan, Ruskin and Mascolo of

Waterbury. A medical disability caused his severance from the law office. He is not presently employed.

The duty of the panel is to determine "whether the committee acted fairly and reasonably or from prejudice and ill will in its consideration of the application." *In re Application of Koenig*, supra, 152 Conn. 133. The panel "must act in the light of the report of the committee as filed and on the full transcript of the committee's hearing; and it must determine whether the [applicant] was afforded his full rights by the committee in the investigation of his application and at the committee hearing." *Pharr* v. *Standing Committee on Recommendations to the Bar*, supra, 32 Conn. Sup. 186.

"The committee should ordinarily find only the ultimate facts. . . . The ultimate facts are reviewable by the court to determine whether they are reasonable and proper in view of the subordinate facts found and the applicable principles of law." *In re Application of Koenig,* supra, 152 Conn. 132–33. The panel's duty is to determine whether the committee acted fairly and reasonably or from prejudice and ill will in its consideration of the application. Id., 133.

The issue raised by this application is "the present fitness of the applicant for reinstatement to again exercise the privileges and functions of an attorney . . . keeping, in view of his previous misconduct, his discipline therefor and any reformation of character wrought thereby or otherwise as shown by his more recent life and conduct." *In re Kone,* 90 Conn. 440, 442, 97 A.307 (1916).

Disbarments are grave and serious actions performed to protect the judicial system and the public. Disbarment is the indefinite deprivation of the privilege to practice law. The disbarred attorney is expelled from his office.

Disbarment is to protect the courts from persons unfit to practice in them; it is not a measure of punishment. The purpose of disbarment is to protect the court and the public from the misconduct of untrustworthy practitioners. *In re Kone,* supra, 90 Conn. 442; *In re Application of Dimenstein,* 36 Conn. Sup. 41, 44, 410 A.2d 491 (1979).

"The proceeding to disbar [or suspend] an attorney is neither a civil action nor a criminal proceeding, but is a proceeding sui generis, the object of which is not the punishment of the offender, but the protection of the court." (Internal quotation marks omitted.) *In re Application of Pagano,* 207 Conn. 336, 339, 541 A.2d 104 (1988).

Good moral character is a necessary and proper qualification for readmission to the bar. "An applicant for readmission to the bar must be possessed of such standards of honor and honesty and have such an appreciation of the distinctions between right and wrong in the conduct of men toward each other as will make him a fit and safe person to engage in the practice of law." *In re Application of Koenig,* supra, 152 Conn. 132.

"As important as it is that an attorney be competent . . . it is infinitely more so that he be upright and trustworthy." *In re Peck,* 88 Conn. 447, 450, 91 A.274 (1914).

"[T]he ultimate burden of proving good character rests upon the applicant." *In re Application of Koenig,* supra, 152 Conn. 132; *Pharr* v. *Standing Committee on Recommendations to the Bar,* supra, 32 Conn. Sup. 186. The argument by the applicant's attorney that disbarment once imposed should be lifted unless the opponents can show acts of immorality or untrustworthiness is misplaced.

"Good moral character is a necessary and proper qualification for admission to the bar. . . . Proof of this is a requirement . . . and the ultimate burden

of proving it may properly be placed, as it is in Connecticut, on the applicant." (Citations omitted.) *In re Application of Warren,* 149 Conn. 266, 274, 178 A.2d 528 (1962). "In this state, the ultimate burden of proving good character rests upon the applicant." *In re Application of Koenig,* supra, 152 Conn. 132.

"It has been the established practice for the court to decline to hear evidence on questions entrusted to bar committees." *In re Application of Koenig,* supra, 133. "Where . . . the decision called in question is within the discretion of the committee, the court reviews the committee's decision on the record of its proceedings to determine whether it has abused its discretion. The hearing is not one de novo." *In re Application of Warren,* supra, 142 Conn. 273–74.

At the panel hearing on February 18, 1993, the applicant was represented by counsel and requested an opportunity to present evidence. Not unmindful of the constraints attendant with these hearings, the panel, to ensure every amenity of due process, nevertheless granted the applicant's request to present evidence in support of his claim of fitness.

The testimony of the eight witnesses was cumulative and not dissimilar to the evidence presented to the committee. No discrete evidence was presented to substantiate a reformation of character otherwise decimated by the murder conviction and consequent disbarment. No specific circumstances were presented to corroborate the claim of fitness and moral trustworthiness. Two witnesses were committee members whose testimony tracked their minority reports. Three witnesses were personal friends who acknowledged having minimal contacts with the applicant since his prison release, or having met with him occasionally for lunch. The remaining two witnesses met the applicant in 1990 through their affiliation with the law office. There has

been little or no contact since his departure. General testimonials, in this milieu, do not reach the requisite level of refuting reasonable inferences arising from the misconduct leading to disbarment. Where the misconduct is murder, and the period of disbarment abbreviated, substantial evidence of moral trustworthiness and fitness is required for reinstatement to the bar.

The panel recognizes that, in a formal sense, the hearing before it is nonadversarial. "There are no adversary parties [to grievance proceedings] in the technical legal sense, although our reports contain cases which, in their titles, carry as parties not only the names of the petitioners [or respondents] but those of bar examining committees and grievance committees." (Internal quotation marks omitted.) *In re Application of Pagano,* supra, 207 Conn. 340.

The panel notes, however, that prior published grievance appeals indicate the appearances of either a state's attorney or special counsel representing the committee before a designated panel. Without the presence of counsel, the hearing is relegated to an ex parte hearing. The issue of reinstating disbarred attorneys is too critical to allow the hearing to be conducted nonadversarially.

Although "every member of the bar has an interest in the admission of an attorney upon motion without examination . . . [w]e see no reason why this should not also be the case in connection with petitions by attorneys who seek readmission . . . ." (Citations omitted; internal quotation marks omitted.) Id. This right to object and contest by bar members is rarely, if ever, used. It is unrealistic to expect that individual practitioners will mount the energy, expense and time to present a formidable case against reinstatement. Intervention and assertion by panel members, whether

in the evidence or argument phase of the hearing, are judicially unseemly and inconsistent with our traditions of neutrality and fair play.

In a letter to the panel dated February 23, 1993, the statewide bar counsel declared that Practice Book § 36 cannot be interpreted as conferring on the counsel or the statewide grievance committee any special status requiring them to take an active adversarial role in reinstatement proceedings.

This panel strongly recommends that for future reinstatement proceedings, the reinstatement committee be represented by counsel in order to ensure a balanced adversarial proceeding. Counsel, if unavailable pro bono, should be reimbursed a reasonable fee by the judicial department.

The main thrust of the applicant's argument is that the committee's denial of his application is solely based on his murder conviction, and that the committee, in effect, has imposed a de facto permanent disbarment, contrary to Connecticut law. The applicant argues correctly that Connecticut does not acknowledge permanent disbarment. Permanent does not mean forever. "[D]isbarment is not punishment for a crime, but, rather the withdrawal of a privilege . . . ." *In re Application of Dimenstein,* supra, 36 Conn. Sup. 44. "Connecticut law provides for distinguishing between revocable and irrevocable disbarments." Id., 46.

Nowhere in the September 22, 1992 twelve page majority report of the committee is the application denied solely because of the class A felony conviction. The committee report states "that the conviction of a crime of this magnitude is such an indelibly negative mark on one's record that it constitutes a permanent character flaw and therefore *should* be an exception to the existing rule of law which does not recognize permanent disbarment." (Emphasis added.) The commit-

tee issued four findings to substantiate its denial. The conviction, although a part of its first finding, is not the sole reason for denial. The committee noted that the conviction was "proximate enough in time to his application" that the disbarment resulting from the conviction was "recent" to his application (less than twelve months) and that the evidence presented was insufficient "to qualify him for reinstatement to the bar."

This panel reads the latter finding as meaning that the evidence presented was inadequate to rebut the reasonable inferences to be drawn from the applicant's misconduct.

The committee's second finding in support of denial rests on the applicant's current parole status. Although the applicant's sentence was commuted to a minimum of twelve years, he nevertheless remains in the legal custody of the parole board for the remainder of his life. His status is governed by General Statutes, § 54-125, which provides, in part, that the parolee remain "in the legal custody and control of the board until the expiration of the maximum term or terms for which he was sentenced."

The applicant is required to abide by twelve specific conditions of parole, including travel, employment, periodic reporting and behavior performance. As the committee's majority report stated: "Failure to comply with these conditions will result in your return to the custody of commissioner of correction and your case will be reported back to the Board of Parole for further consideration."

The disabilities of a parolee are myriad. A parolee cannot vote, cannot hold public office, and cannot serve as a juror. General Statutes §§ 9-46, 9-46a. Parolees sentenced to life imprisonment remain in the legal custody and supervision of the parole board for the

remainder of their lives. They can neither travel nor work without the approval of their parole officers. They are subject to reincarceration upon the violation of any of their parole conditions or upon arrest or conviction of any crime. This is manifestly a heavy burden to impose upon a client whose fortune and life may be entrusted to a parolee-attorney.

Further, a parolee-attorney would be required to disclose this disability to clients and to potential jurors. See *Phillips* v. *Warden,* 220 Conn. 112, 595 A.2d 1356 (1991). Clients not unexpectedly would have their cases compromised upon disclosure that their designated attorney was a lifetime parolee.

Parole is the equivalent of de jure confinement. Release of the parolee is at the sufferance of the parole board. Diligent research has failed to discover in our sibling states any precedential guidance in dealing with the reinstatement of disbarred lifetime parolees.[1]

The committee's third finding is the absence of a meaningful time period between disbarment and the date of the applicant's motion to be reinstated. It was less than twelve months. The disbarment went unchallenged. On June 25, 1990, a Superior Court judge found the applicant unfit and morally untrustworthy to practice law in Connecticut. Although the rule of no permanent disbarment impliedly imposes no time restrictions on filing motions for reinstatement, it is clear that the shorter the time frame between disbarment and reinstatement, the heavier the burden of persuasion upon the applicant.

A redemptive and rehabilitative life requires the passage of time for documentation. The more serious the

---

[1] The Supreme Court of Florida has held that restoration of civil rights following a felony conviction is a necessary prerequisite to obtaining the privilege of practising law. *The Florida Bar* v. *Clark,* 359 So. 2d 863, 864 (Fla. 1978).

misconduct, the more time required to meet the burden of moral trustworthiness. While this panel does not articulate a specific time standard for particular acts of misconduct, manifestly, a conviction of the crime of murder requires the passage of a reasonably substantial period of time to evaluate the applicant's fitness.

In *Phillips* v. *Warden,* supra, 220 Conn. 140, a habeas petition alleging ineffective assistance of counsel on the part of the applicant here, the Supreme Court stated: "Avcollie had been convicted of murdering his wife by strangling her to death, a crime of violence of the first order of seriousness . . . ."

Remorse and contrition bespeak a redemptive life. A September 28, 1992 minority report underscored the applicant's "degree of remorse." Before this panel, the applicant declared: "I have done nothing to warrant this persecution." The applicant's protestations of non-culpability in the death of his wife raise serious questions of concern.

The applicant submitted to the panel an evaluation by Cathy A. Levy, Ph.D., a psychologist, prepared for the board of pardons, Levy stated that "it seems unlikely that he would reoffend." This is not the talisman of moral trustworthiness to practice law. The psychological evaluation states further "that petitioner's inability to form mature, intimate, personal relationships may have led to the tragic death of his first wife. He does not feel he can practice law again, even if his license becomes unrevoked."

No evidence was presented to the committee or to this panel of any previous or current psychiatric or family violence counseling received by the applicant. The letters and testimony were general testimonials from a small circle of family and friends imploring rein-

statement on grounds of compassion and nonculpability. No discrete acts of moral trustworthiness were supplied to the panel or to the committee.

The applicant's heavy reliance on *Pharr* v. *Standing Committee on Recommendations to the Bar,* supra, 32 Conn. Sup. 183 is unwarranted. Attorney Pharr was disbarred for alleging untrue facts in his pleadings and was required to wait twenty-one years before his successful reinstatement.

The fourth and final finding concludes that the murder conviction creates an irresolvable conflict of interest for the applicant. *Phillips* v. *Warden,* supra, 220 Conn. 116. Phillips was convicted on April 8, 1983, of the crimes of sexual assault and burglary. Id. Phillips filed a habeas writ claiming ineffective assistance of counsel, asserting that the applicant was burdened by an actual conflict of interest. Id., 116–17. The petition was granted and a new trial ordered for Phillips. Id., 143.

"Surely, no other attorney in the history of Connecticut or American jurisprudence has ever brought with him to the criminal jury courtroom the potential for prejudice to his client that Avcollie brought to the Waterbury courtroom in April, 1983. . . . [W]e are constrained to conclude that there was a constitutionally impermissible risk that [Phillips'] jurors would identify Avcollie's status as a convicted murderer with his client's status as an accused rapist . . . and that they would transfer to [Phillips] the distaste or revulsion that they may have felt for his lawyer." Id., 141. The court concluded that Phillips' conviction resulted from a violation of the applicant's duty of loyalty to his client. Id., 144. This panel does not find unreasonable the committee's concern that the same violation of duty would likely resurface in the event of reinstatement.

Nearly six years after his conviction for murder, the applicant placed a client (Phillips) at risk, because of

an acknowledged need for funds to underwrite his own appeal. This manifest and conceded violation of rule 1.7 (b) of the Rules of Professional Conduct further supports the committee's conclusion that the applicant is morally unfit to practice law.

Before the panel and in his brief, the applicant argued that the denial of his application constituted a violation of General Statutes §§ 46a-79 and 46a-80. The reliance on § 46a-79 to bootstrap himself into readmission misreads our law. Section 46a-80 (a) provides in pertinent part: "[A] person shall not be disqualified . . . to practice . . . in any . . . profession . . . for which a license . . . is required . . . solely because of a prior conviction of a crime." The short answer is that §§ 46a-79 and 46a-80 are inapplicable to the regulation and supervision of the bar. If it were otherwise then every attorney-felon could circumvent Practice Book § 36 by simply reciting § 46a-79.

"Fixing the qualifications for, as well as admitting persons to, the practice of law in this state has ever been an exercise of judicial power. . . . This power has been exercised with the assistance of committees of the bar appointed and acting under rules of court. . . . It is the court, and not the bar, or a committee, which takes the final and decisive action." (Citations omitted; internal quotation marks omitted.) *In re Application of Warren,* supra, 149 Conn. 272.

The applicant's characterization of attorney licensure as a "job" misreads the role of the professional attorney. Even if the contentions were remotely sound the application of this statute to lawyers would not pass constitutional muster.

The committee's position that General Statutes § 51-91a requires a disbarment period in excess of seven years has merit. This issue was left unchallenged by the applicant.

Section 51-91a (c) provides in pertinent part: "If the court suspends the attorney, the period of suspension shall be not less than seven years for the conviction of a class A felony . . . ."

A disbarment is a more severe form of discipline than a suspension. Where a suspension is required by public policy to be no less than seven years for a class A felony, then a fortiori, a disbarment can and should be for no less than a period of seven years. It would clearly contravene the legislative intent of § 51-91a (c) to disbar an attorney for a class A felony conviction and to reinstate him in less than the seven year period statutorily mandated for a suspension.

The panel has examined carefully the documents submitted. There are thirty-two letters and one psychological evaluation. Nearly one third of the letters are from employees and former inmates of the state prison in Somers. The balance, from family and personal friends, urge the board of pardons to commute the applicant's sentence on humanitarian grounds.

Included in the applicant's brief is an investigative report by William V. Mulvey, Jr., dated December 9, 1983, addressed to the applicant's trial attorneys. The report purports to search for jury wrongdoing. The exhibit is irrelevant and immaterial to these proceedings and counsel is admonished for including this report as part of its brief to the panel. Its inclusion demonstrates a misunderstanding of these proceedings.

The applicant's principal argument is twofold: (1) disregard the misconduct resulting in the disbarment; and (2) the absence of a demonstration of moral unfitness at the time of his application warrants reinstatement. The flaws inherent in this argument would require shifting the burden of proof from the applicant

to the committee, and would preclude the committee from drawing reasonable inferences from the convicted crime and any misconduct relating to it.

In affirming the committee's decision to deny reinstatement, the panel does not necessarily hold that an attorney convicted for the crime of murder is to be permanently disbarred; it is expected, prior to reinstatement, that the applicant's civil rights will be restored.

The applicant's inability or unwillingness to understand the enormity of his misconduct coupled with the brief period of disbarment raises serious questions as to whether his character has been sufficiently reformed.

Disbarment is not a means or measure of punishment. The accepted rule is "the present fitness of the applicant for reinstatement to again exercise the privileges and functions of an attorney as an officer of the court and confidential manager of the affairs and business of others entrusted to his care. . . ." *In re Kone,* supra, 90 Conn. 442.

The law requires a reformation of character as demonstrated by an applicant's more recent life and conduct. The more egregious the misconduct resulting in disbarment, the greater the proof of moral character and trustworthiness required for reinstatement. Declarations of good moral character do not necessarily refute the evidence of bad moral character reasonably inferable from the prior egregious misconduct. A deflection of the misconduct and a consistent denial of culpability by the applicant, in the face of overwhelming evidence, requires a higher demonstration of rehabilitation, redemption and fitness than was presented before the committee or this panel. The committee could rightfully conclude that an insufficient period of time has elapsed from disbarment to application and

that the applicant's behavior subsequent to the disqualifying misconduct does not demonstrate sufficient fitness for reinstatement to the practice of law.

The panel concludes that the committee did not act with any ill will, animosity or prejudice toward the applicant and that the committee fairly and reasonably reached its conclusion on the basis of the evidence before it.

This panel can reasonably and logically conclude that the reasons advanced by the committee to support its recommendations were not without merit and substance. For the aforesaid reasons, the application for reinstatement is denied.