[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I PROCEDURAL HISTORY
The petitioner in the above-referenced case, Vance Johnson, filed a four count revised amended habeas corpus petition, dated April 3, 2001, in which he alleges that his trial counsel, Attorney Fred DeCaprio, performed ineffectively, thereby violating the petitioner's Sixth Amendment right to counsel. The respondent Warden filed a return, dated April 30, 2001, which denies the petitioner's claims. In his habeas corpus petition, the petitioner claims in count one that counsel failed to properly investigate the state's factual allegations and failed to preserve a 911 tape related to misconduct evidence which was admitted at the criminal trial; in count two, the petitioner claims that counsel was "distracted" by the participation of a second defense lawyer, Karen Goodrow, during the jury selection process; in count three, the petitioner claims that counsel improperly permitted a certain juror to be dismissed in spite of the petitioner's wishes to the contrary; and in the fourth count, the petitioner alleges that counsel failed to withdraw from the case even though the petitioner filed grievances against him, failed to present relevant evidence on the petitioner's behalf and erroneously advised the petitioner that he was required to take the witness stand in order to get the presiding judge to instruct the jury on the issue of self-defense. CT Page 564
The habeas corpus petition was tried to this court on September 10, October 1, and Oct. 15, 2001, and both the petitioner and the respondent offered testimonial and documentary evidence in support of their respective positions. After reviewing the evidence and the relevant legal authority, the court dismisses the petitioner' s habeas claims for the reasons set forth below.
 II FACTS
On December 9, 1996, the petitioner pleaded guilty to the charge of criminal possession of a firearm in violation of General Statutes §53a-217 and received a sentence of five years of incarceration. Shortly thereafter, he was convicted at a jury trial of intentional murder in violation of General Statutes § 53a-54a and was sentenced to serve a sixty year prison term concurrently with his sentence for criminal possession of a firearm. The petitioner's murder conviction was affirmed on appeal in State v. Johnson, 53 Conn. App. 476 (1999), cert. denied,249 Conn. 929 (1999). The jury in the petitioner's criminal trial reasonably could have found the following facts which are set out in the Appellate Court decision.
 The [petitioner] and the victim, Christopher Gills, had been friends for years, but they became estranged about two months before the shooting. On June 28, 1994, the night before the shooting, the defendant went to the victim's mother's house searching for him. In a discussion with Kevin Walker, a friend of the victim, the [petitioner], who had a gun, told Walker that he was going to shoot the victim when he found him.
 About noon on June 29, 1994, the [petitioner] was at a car wash on Homestead Avenue, near the corner of Woodland Street in Hartford. Seeing the victim driving by, the [petitioner] flagged him down. The victim, who was with Damion Bullock, pulled the car over, exited and began talking to the [petitioner]. Bullock remained in the passenger seat of the car. At that point, the [petitioner] displayed a gun that he had wrapped in a shirt. The victim went back to his car, reached under the seat and brought out a gun.
 The victim laid the gun on the roof of his car and CT Page 565 put his hand over the gun. The [petitioner] reached back to get the clip for his gun from another man who was standing nearby. When the [petitioner] removed the shirt that was covering the gun, Bullock exited the car and fled.
 The [petitioner] and the victim continued to argue as they moved into the street. The victim began to walk backward, with his palms facing forward and his elbows back. At that moment, there was nothing in the victim's hands. The [petitioner] fired three shots and the victim fell to the ground. The defendant walked over to where the victim lay, then returned to his car and drove away. The victim sustained two gunshot wounds to his abdomen, which resulted in his death from loss of blood.
 A few hours after the shooting, Kevin Walker, Eddie Walker and other friends of the victim were standing in front of 328 Cornwall Street. The [petitioner] drove up in a car, displayed a gun, and said, "Somebody out there don't like what I did to your boy." The [petitioner] continued down the street, turned the car around, and fired a number of shots as he drove by the group.
 At trial, the [petitioner] admitted that he shot the victim, claiming that he did so in self-defense. The [petitioner] testified that while standing in front of the car wash, gun in hand, he saw the victim drive by. He wanted to speak to the victim about a stolen cellular telephone sold by the victim, which was no longer working. He waved the victim over and they began to talk. The [petitioner] took the shirt off the gun because he wanted to show it to the victim, who sold guns as well as telephones. The [petitioner] stated to the victim that he wanted to exchange the telephone and the victim became angry. They walked to the victim's car where the victim opened the driver's door and leaned in.
 The [petitioner] testified that at that point the victim leaned on the roof of the car and pointed a gun at him. The [petitioner's] companion came over and handed him a clip, which the [petitioner] inserted into his gun. The victim then walked into the middle CT Page 566 of the street and asked the [petitioner] if he wanted "trouble." The [petitioner], carrying his loaded weapon, joined the victim in the street. The [petitioner] stated that he attempted to talk to the victim, but the victim began to put a bullet in the chamber of his gun. Although the victim was unsuccessful in chambering the bullet, the [petitioner] fired three shots at the victim from a distance of twelve to fifteen feet.
 The [petitioner] also testified that he fled to Middletown where he used an alias and a forged identity card. Before being arrested, the [petitioner] called the police and attempted to implicate someone else in the shooting. After his arrest, the [petitioner] told the police that he was at his grandmother's house at the time of the shooting.
At the habeas trial, the court heard testimony from the petitioner, DeCaprio and other witnesses regarding events at the petitioner's criminal trial and events related to the underlying criminal case. In addition, the trial court transcript and other exhibits were admitted into evidence. The court makes the following findings of fact in the habeas trial based on its review of all of the evidence. DeCaprio was, at the time he represented the petitioner at the latter's criminal trial, an experienced criminal defense lawyer who had acted as counsel in capital felony litigation and had tried several murder cases to verdict. Both before and after the start of jury selection in the petitioner's murder trial in December of 1996, DeCaprio and the petitioner met and discussed the elements of the murder charge, including the lesser included offense of manslaughter, the factual allegations and the theory of defense. In addition, DeCaprio reviewed the entire state's file, including all the police reports, and employed the services of a private investigator named Matt Bolden. The investigator spoke with potential witnesses, including a misconduct witness named Tina Mathis. Bolden completed his investigation and provided DeCaprio with a written report to assist in the petitioner's defense. The petitioner received a copy of the investigator's written report before trial.
Initially DeCaprio planned to defend against the intentional murder charge by raising the issue of misidentification but, subsequently, decided to claim self-defense and lack of intent when the petitioner admitted to counsel that the petitioner had lied about his whereabouts on the day of the crime; falsely implicated another person as the perpetrator; fled the Hartford area after the shooting and used a false name prior to his arrest. CT Page 567
During the jury voir dire DeCaprio conferred with the petitioner and Goodrow about the use of peremptory challenges, but examined potential jurors and made the final decision about the use of the peremptory challenges himself Goodrow, whom at the time was an attorney experienced in defending murder cases, was not present in the courtroom for more than one day and agreed to end her participation on DeCaprio's request when he informed her that the petitioner told him that she was overly intrusive" and a "distraction" in the jury selection process.
Prior to the completion of the trial evidence, DeCaprio told the petitioner that it was possible to obtain a jury instruction on self-defense if the petitioner failed to take the witness stand, but that his chances of success would be enhanced if he testified. After seeing the evidence develop, however, counsel ultimately recommended to the petitioner on the record that he not take the witness stand. The presiding judge then queried the petitioner to ensure that the petitioner understood his Fifth Amendment rights and his lawyer's advice. The petitioner indicated that he understood his rights and the advice, but nevertheless decided to reject counsel's advice and testified that he shot the victim in self-defense. At the habeas trial, the petitioner admitted that his criminal trial testimony was critical and that it harmed his defense.
In its case-in-chief at the criminal trial, the state offered misconduct evidence through Mathis, Kevin Walker and Ed Walker, which established, along with other evidence, the requisite intent for the charge of intentional murder. The testimony of Mathis, which was admitted by the trial judge over DeCaprio's objection, showed that on the afternoon of June 29, 1994, subsequent to the time of day when the victim was killed, Mathis looked through the window on the first floor of her home at 304 Cornwall Street and saw the petitioner fire a weapon from a green car. Mathis' daughter, who was in the basement of the home, called the police to report shots fired while Mathis was on the first floor watching the petitioner. The Hartford 911 and "Hart Beat" records fail to document a call from 304 Cornwall Street to the Hartford Police Department at or about the time when Mathis' daughter called the police. However, all calls to the Hartford Police Department are not necessarily recorded. The records do show that a green or turquoise car and a white car, as well as persons on foot, were involved in shooting incidents in the Cornwall Street area at or about the time Mathis' daughter called the police.
When the petitioner was in the green car on Cornwall Street, both Kevin Walker and Ed Walker, who were friends of the victim, were told by the petitioner that "somebody out there don't like what I did to your boy" and CT Page 568 saw him fire shots from the moving vehicle.
Upon the conclusion of the evidence, DeCaprio requested that the presiding judge give an instruction on the charge of manslaughter in the first degree as a lesser included offense of intentional murder. The petitioner informed the court that he wanted the charge limited to murder only. The judge, however, gave the lesser included offense charge as requested by DeCaprio.
Partway through the jury deliberations, the jury asked to rehear the testimony of Mathis. Specifically, the jury was interested in knowing whether Mathis identified the petitioner as the person who was shooting from the car. The jury also asked to rehear the court's instructions on manslaughter. The court complied with the jury's requests. Subsequently, the jury found the petitioner guilty of the intentional murder charge. Additional facts will be provided as necessary.
 III DISCUSSION
The standard of review for cases involving claims of ineffective assistance of counsel is well settled. The Appellate Court articulated the standard in Goodrum v. Commissioner of Correction, 63 Conn. App. 297,299-301 (2001) where it stated the following:
 A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel. . . . In Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show "that counsel's assistance was so defective as to require reversal of [the] conviction . . ." That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. (Citations omitted; internal quotation marks omitted.) Minnifield v. Commissioner of Correction, 62 Conn. App. 68, 70-71, 767 A.2d 1262 (2001); see Phillips v. Warden, 220 Conn. 112, 132, 595 A.2d 1356 (1991).
CT Page 569
 The first component of the Strickland test, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In Strickland, the United States Supreme Court held that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense, after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citation omitted; internal quotation marks omitted.) Minnifield v. Commissioner of Correction, supra, 62 Conn. App. 71-72.
 Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) Id., 72. Therefore, "[a] habeas court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if the claim may be disposed of on the ground of an insufficient showing of prejudice." Williams v. Commissioner of Correction, 41 Conn. App. 515, 519, 677 A.2d 1 (1996), appeal dismissed, 240 Conn. 547, 692 A.2d 1231 (1997).
CT Page 570
Keeping in mind this standard for determining the validity of habeas corpus petitions based on claims of ineffective assistance of counsel, the court will now address the claims made by the petitioner in the present case.
 A First Count — Misconduct Evidence
In the first count, the petitioner alleges that DeCaprio gave him incomplete advice, failed to do an adequate investigation and failed to preserve the Hartford Police Department 911 tape made during the afternoon of the shooting on June 29, 1994 on Cornwall Street. The petitioner has failed to prove his claims by a preponderance of the evidence. Further, the evidence shows that counsel's failure to subpoena the 911 tapes and "Hart Beat" records was based on sound trial strategy. Even if counsel had obtained and offered the tape and records in evidence, it is not reasonably probable that they would have changed the outcome of the trial.
DeCaprio, who was familiar with the contents of the state's file, thoroughly discussed with the petitioner the elements of the offenses charged, the factual allegations and the possible defense theories. He also employed the services of Bolden, the private investigator, who interviewed witnesses, including Mathis, and provided the petitioner with a copy of the investigation report. DeCaprio was aware, based on his review of the one of the police reports and the testimony of the Walkers and Mathis, that the petitioner was in a green or turquoise car on Cornwall Street near the time Mathis' daughter called the police. Further, the 911 tape and the "Hart Beat" records document calls from Cornwall Street residents who complained about shooting incidents involving two cars, one white and another green.
At the time of the criminal trial, counsel knew that the petitioner claimed to have been shot at while near Rawson School on Cornwall Street. The petitioner claims that if the jury had known that some of the 911 calls mentioned gunplay near Rawson School, the testimony of Mathis would have been destroyed because her home at 304 Cornwall Street is three blocks away from the school and therefore she could not have seen the petitioner discharge a firearm. The petitioner also claims that the 911 tape and "Hart Beat" records would have impeached the credibility of Mathis because they do not show a call from her residence in the afternoon on June 29, 1994. One problem with the petitioner's argument is that Mathis clearly indicated that the petitioner was shooting from a green car in front of her house at 304 Cornwall and said nothing about Rawson School. Another problem with the petitioner's argument is that all CT Page 571 calls to the Hartford Police Department are not necessarily recorded. Hence, there could have been a call to the Hartford Police from Mathis' home that simply is not accounted for on a 911 tape or the "Hart Beat" records. A third problem with his argument is that contrary to the petitioner's claim, DeCaprio did attempt to impeach the credibility of Mathis through cross-examination. Through counsel's cross-examination, Mathis was forced to admit that she had been friends with the victim for years. DeCaprio also got Mathis to deny that anyone at her house had spoken to the police about the shooting even though on the state's direct examination she claimed that her daughter had done so. Despite counsel exposing the apparent bias and inconsistent testimony of Mathis through cross-examination, the jury was entitled to believe her anyway if it chose to do so.
The petitioner argues that since the jury asked to rehear Mathis' identification testimony and to be re-instructed on the crime of manslaughter, her testimony made the critical difference on the issue of intent and resulted in a murder conviction in lieu of one for manslaughter. This claim is no more than sheer speculation and there is nothing in the criminal trial or habeas trial evidence to suggest that the jury failed to do what all criminal juries are instructed to do, i.e., consider the evidence in its entirety before reaching a verdict. In the petitioner's criminal trial, there was evidence apart from the testimony of Mathis which tended to establish the requisite intent for murder. One example is the testimony of Kevin Walker showing that the petitioner, while armed with a gun, searched for the victim on the day of the killing and said he would shoot the victim.
Moreover, the petitioner is disingenuous in his assertion that the Mathis testimony made the difference between a murder and a manslaughter conviction because the petitioner himself told the presiding judge that notwithstanding his attorney's request for the lesser included offense of manslaughter, he wanted a jury instruction on the charge of murder only. If the trial judge had complied with the petitioner's request for a murder charge only the petitioner would have still been convicted and be in the same position he currently occupies.
In light of the counsel's knowledge about the petitioner's statements and conduct related to the murder and the Cornwall Street shooting, the advice he gave the petitioner not to testify was complete and based on sound trial strategy. If DeCaprio had obtained the 911 tape and "hart beat" records and successfully offered them into evidence, they probably would have damaged the petitioner's case, not helped it, because that evidence would have corroborated the testimony of the Walkers and Mathis. There is no persuasive evidence which shows that it is reasonably probable that the result of the trial would be different if DeCaprio had CT Page 572 chosen to employ different tactics during the criminal trial.
 B Second Count — Attorney Goodrow
The petitioner alleges in the second count of the petition that DeCaprio performed deficiently by employing the assistance of Goodrow, whose participation in the trial was a "distraction." He further claims that Goodrow interfered with his defense. The court rejects the petitioner's claims because there is no evidence that Goodrow's conduct adversely affected DeCaprio's performance as trial counsel or otherwise resulted in harm to the defendant's case. Goodrow, who was an attorney experienced in defending murder cases at the time of the petitioner's trial, only participated in jury selection for one day, and her participation was limited to conferring with both DeCaprio and the petitioner about the use of peremptory challenges. DeCaprio conducted the voir dire of venire persons by himself and reserved to himself alone the ultimate decision on how to use the peremptory challenges. After the petitioner made it known to DeCaprio that the petitioner thought Goodrow was "over intrusive," the two lawyers and the petitioner discussed the situation and Goodrow decided to end her participation injury selection pursuant to DeCaprio's request.
There simply is no evidence to support the petitioner's claim that Goodrow caused DeCaprio to perform ineffectively as trial counsel. Even assuming, without deciding, that DeCaprio performed deficiently by permitting Goodrow to participate as a consultant during jury selection, it is not reasonably probable that her absence would have made a difference in the verdict. The petitioner has failed to offer any persuasive evidence that he would have been acquitted entirely or convicted of a less serious charge but for the presence of Goodrow during jury selection.
 C Third Count — The Dismissed Juror
In count three, ¶ 10 of the habeas petition, the petitioner, who is African-American, alleges that DeCaprio performed deficiently when he "agreed to the dismissal of one of the selected jurors, over the petitioner's objection." The pleadings do not specifically mention the name, race, gender or residence of the dismissed juror, and the only evidence offered by the petitioner regarding his claim is that jurors from "the suburbs" were taken instead of those from "the north end" of Hartford. At the habeas trial the petitioner claimed that north end CT Page 573 jurors would have been more favorable to him than ones from the suburbs. It is implicit in the petitioner's claims and habeas testimony that at the time of his criminal trial he was a resident of the north end of Hartford.
The court finds the following additional facts which are relevant to the petitioner's dismissed juror claim. A regular juror, John Shook of Wethersfield, whose race is unspecified, was excused prior to the start of the criminal trial evidence and replaced by Joseph Fitzgerald, an alternate juror from Avon, whose race is also unspecified. The trial judge, as well as both counsel and the petitioner, heard Shook's on-the-record representation that his participation in the trial would jeopardize his employment. They also heard Shook's claim that because he was required to work the night shift before reporting to court during the day, he would have difficulty staying awake during the trial testimony. Contrary to the allegation made in count three, ¶ 10 of the pleadings, the petitioner did not personally object to the release of the excused juror. In fact, the parties agreed with the trial judge's finding that there were legitimate reasons to excuse Shook for cause. DeCaprio's failure to object to the dismissal of Shook was clearly a sound trial tactic, not deficient performance. Competent counsel may not have wanted to keep a juror who, while fearful of losing his job on account of jury service, might feel resentment toward the petitioner if counsel had objected to the dismissal. The failure to object was also tactical because a sleepy juror would have been less than completely attentive to the petitioner's self-defense claim.
There is no evidence that Shook, who was not from the north end of Hartford, was a member of a racial minority group or was more objective than anyone who served on the regular jury panel. Further, even assuming that Shook was a member of a racial minority group and was more objective than someone from the suburbs who served on the regular jury, the petitioner's argument that his presence would have made a difference in the trial's result is nothing more than speculation. Simply because a juror and the petitioner may have shared the same race, gender and neighborhood, indicates little or nothing about how the juror might assess the evidence.
The petitioner's ineffective assistance claim regarding the dismissed juror fails because there is no proof that DeCaprio performed deficiently in failing to object to Shook's removal and no proof that it is reasonably probable that the result of the trial would have been different if Shook had been retained on the jury.
 D CT Page 574 Fourth Count — Failure to Withdraw
The petitioner's final allegation in the fourth count, ¶ 10 of the petition is that DeCaprio failed to withdraw as counsel from the petitioner's case even though the latter had filed two grievances against him. Although the petition does not explicitly claim a conflict of interest between DeCaprio and the petitioner, such claim is implicit in the pleadings and the evidence which the petitioner offered at trial.
The court finds the following additional facts which are necessary to address the petitioner's failure to withdraw claim. Sometime after DeCaprio was appointed as counsel for the petitioner, the latter filed a grievance against DeCaprio in late 1994 when DeCaprio refused to comply with the petitioner's request that counsel file a motion for a bond reduction. The petitioner also asked that DeCaprio, who is a public defender, to withdraw as counsel and asked the trial judge to appoint a special public defender in his place. DeCaprio refused to withdraw, and the court either failed or refused to act upon the petitioner's motion for a special public defender. The petitioner filed a second grievance against DeCaprio for some unspecified reason after the petitioner was convicted at trial.
Shortly after jury selection commenced, the petitioner pleaded guilty to criminal possession of a firearm in front of Judge Carmen Espinoza. When Judge Espinoza canvassed the petitioner to ensure that his plea was voluntary, the petitioner indicated he was satisfied with DeCaprio's representation and that the two had resolved their differences.
The legal standard for assessing ineffective assistance claims based on an alleged conflict of interest is articulated in Phillips v. Warden,220 Conn. 112, 132-133 (1991), where our Connecticut Supreme Court indicated the following:
 Different standards apply to different types of claims of ineffective assistance of counsel. Where the [petitioner] presents a claim of actual ineffectiveness . . . that is, when he challenges his lawyer's performance in the trial court, he must show that: (1) his counsel's performance was deficient in the sense that the counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment; and (2) the deficient performance prejudiced the defense . . . in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . In such a CT Page 575 case, therefore, the defendant must establish (1) deficient performance, and (2) actual prejudice.
 Where, however, the [petitioner] claims that his counsel was burdened by an actual conflict of interest . . . the [petitioner] need not establish actual prejudice. . . . Where there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. . . . In a case of a claimed conflict of interest, therefore, in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance.
(Citations omitted; internal quotation marks omitted.)
The Appellate Court stated in Mercer v. Commissioner of Correction,51 Conn. App. 638, 644-645 (1999) that "[a]n actual conflict of interest exists when the aim or goal of trial counsel diverges from the interests of the client. . . . [T]he possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a [petitioner] must establish that an actual conflict of interest adversely affected his lawyer's performance. . . . To demonstrate an actual conflict of interest, the petitioner must be able to point to specific instances in the record which suggest impairment or compromise of his interests for the benefit of another party." (Citations omitted; internal quotation marks omitted.)
The court having considered the aforementioned legal standard hereby finds that the petitioner has failed to prove that DeCaprio had an actual conflict of interest at the time he represented the petitioner or that if he did, it adversely affected counsel's performance. The credible evidence shows that DeCaprio was familiar with the state's factual allegations against the petitioner, the relevant law and communicated with the petitioner about the defense theories. DeCaprio's worked to obtain an acquittal for the petitioner on the charge of intentional murder or a conviction on a lesser offense. DeCaprio considered the petitioner's views during voir dire and pursued the self-defense claim requested by the petitioner. Counsel also objected to the misconduct evidence offered by the state on the issue of intent and persuaded the CT Page 576 trial court to instruct the jury on the offense of manslaughter, which provided the jury with an option to the charge of intentional murder. The evidence clearly establishes that the goals of trial counsel did not diverge from those of the petitioner, i.e., the goal of having the petitioner found not guilty on the charge of intentional murder. The petitioner has failed to point to anything specific in the record which suggests the impairment or compromise of the petitioner's interests in favor of DeCaprio or anyone else. The mere fact that the petitioner filed a grievance against DeCaprio at sometime prior to trial does not, in and of itself, demonstrate an adverse interest between counsel and the petitioner. The petitioner himself told Judge Espinoza during the course of the trial that he and DeCaprio had resolved their differences. The petitioner will not be permitted now to claim that those resolved differences amounted to an actual conflict of interest. Insofar as the second grievance is concerned, there is no evidence indicating what it was based on. The court cannot and will not speculate about its basis and finds that there is no evidence it could not have affected counsel's performance at trial since it was not filed until the trial had concluded. DeCaprio did not withdraw as counsel after the petitioner filed the first grievance because the petitioner failed to offer a good reason for him to do so. Further, DeCaprio's decision to leave it to the trial judge to decide whether to appoint a special public defender was appropriate under the circumstances. In State v. Drakeford, 202 Conn. 75,83-84 (1987), our Connecticut Supreme Court said the following:
 There is no unlimited opportunity to obtain alternate counsel . . . It is within the trial court's discretion "to determine whether a factual basis exists for appointing new counsel. . . . Moreover, absent a factual record revealing an abuse of that discretion, the court's failure to allow new counsel is not reversible error. . . . Differences of opinion over trial strategy are not unknown, and do not necessarily compel the appointment of new counsel. . . . A request for substitution of counsel requires support by a substantial reason, and may not be used to achieve delay. . . . [T]he court cite[s] with approval the American Bar Association Project On Standards For Criminal Justice: [A] defendant is entitled to make the ultimate decision only in regard to whether to plead guilty, whether to waive a jury, and whether to testify; all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client. . . . A defendant has no unbridled right to discharge counsel on the eve of trial. . . . In order to work a delay by CT Page 577 a last minute discharge of counsel there must exist exceptional circumstances.
(Citations omitted; internal quotation marks omitted.)
In light of State v. Drakeford, supra, it was entirely appropriate for DeCaprio to leave it up to the trial judge to exercise his discretion regarding the appointment of a special public defender for the petitioner. The petitioner did not offer any substantial factual basis to show why a special public defender should have been appointed during the criminal trial. In addition, the mere existence of disagreements between DeCaprio and the petitioner over trial strategy is not a basis for the appointment of a special public defender.
The petitioner's claim that his filing of grievances against DeCaprio created an actual conflict of interest which adversely affected the latter's performance as trial counsel is unproven and without merit.
 IV CONCLUSION
The petitioner has failed to prove by a preponderance of the credible evidence any of the allegations in his four count revised amended habeas petition. Therefore, the entire habeas petition is dismissed.
White, J.